SPN:RTP/EDP/KTF
F. #2019R00033

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>DAVID MOTOVICH,<br><br>                Defendant. | COMPLAINT AND AFFIDIVAT IN SUPPORT OF APPLICATION FOR <u>ARREST WARRANT</u><br><br>Criminal Case No. 21-MJ-979 (MMH)<br><br>(T. 18, U.S.C., §§ 1028A(a)(1), 1028A(c)(5), 1344 and 1512(b)(3)) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

   Christopher J. Cabane, being duly sworn, deposes and states that he is a Special Agent with the Internal Revenue Service, duly appointed according to law and acting as such.

   In or about and between January 2012 and February 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DAVID MOTOVICH, together with others, did knowingly and intentionally execute a scheme to defraud financial institutions, and to obtain moneys, funds, credits and other property owned by, and under the custody and control of such financial institutions, by means of one or more materially false and fraudulent pretenses, representations and promises.

   (Title 18, United States Code, Section 1344)

   In or about and between January 2012 and February 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DAVID MOTOVICH, together with others, during and in relation to the crime of bank fraud, did

knowingly and intentionally possess and use, without lawful authority, means of identification of one or more persons, knowing that the means of identification belonged to other persons.

(Title 18, United States Code, Sections 1028A(a)(1) and 1028A(c)(5))

In or about and between January and February 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DAVID MOTOVICH, together with others, did knowingly, intentionally and corruptly persuade another person, and attempt to do so, with intent to hinder, delay and prevent the communication of information relating to the commission and possible commission of a federal offense to a law enforcement officer of the United States.

(Title 18, United States Code, Sections 1512(b)(3))

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Internal Revenue Service ("IRS") and have been since 2007.  I have been involved in the investigation of numerous cases involving violations of the Internal Revenue Code, money laundering statutes, Bank Secrecy Act and statutes prohibiting bank fraud and aggravated identify theft, among other statutes.  I am familiar with the facts and circumstances set forth below from my participation in the investigation and from my review of the investigative file and reports of other law enforcement officers involved in the investigation.

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

I.      The Defendant DAVID MOTOVICH's Fraud Scheme

               2.      The Bank Secrecy Act, codified at Title 31, United States Code, Sections 5313-5326, is a set of law and regulations enacted by Congress to address an increase in criminal money laundering through financial institutions, including check cashers.

               3.      Check cashers, which are defined as persons in the business of "accept[ing] checks . . . in return for currency or a combination of currency and other monetary instruments or other instruments, in any amount greater than $1,000 for any person on any day in one or more transactions," see 31 C.F.R. Section 1010.100(ff)(2), are considered money transmitters under federal law, see Title 31, United States Code, Section 5330(d)(1), and are subject to federal regulations to ensure that the business is not used to facilitate illegal activity, including being required to, among things: register with the United States Department of Treasury's Financial Crimes Enforcement Network as a money transmitting business, see 31 C.F.R. Section 1022.380; file Suspicious Activity Reports ("SARs") concerning any illegal activity conducted through the transmitting business by its customers, see Title 31, United States Code, Section 5313(g); and report movements of United States currency of more than $10,000 in Currency Transaction Reports ("CTRs") to the federal government, see Title 31, United States Code, Section 5313(a).

               4.      The defendant DAVID MOTOVICH manages a family-run business that supplies building materials and equipment ("the Lumber Company") to building contractors operating in the New York City metropolitan area. The Lumber Company is located in the Midwood section of Brooklyn, New York.

               5.      Since at least 2012, the defendant DAVID MOTOVICH, together with others, has operated an illegal check cashing business from MOTOVICH's office at the Lumber

Company. The customers of MOTOVICH's illegal check cashing business are primarily the owners and operators of construction companies who pay their employees in cash to avoid having to pay state and federal employment taxes, including taxes owed under the Federal Insurance Contributions Act. As part of the scheme, MOTOVICH has cashed millions of dollars of checks in exchange for a fee or a percentage of the face amount of the checks, ranging between four and ten percent. MOTOVICH's customers could have paid a lower fee at a licensed check cashing business but chose to pay the higher fee charged by MOTOVICH because, among other reasons, the customers understood that MOTOVICH would not file CTRs for cash transactions in amounts greater than $10,000 or file SARs. In addition, MOTOVICH supplied his check cashing customers with fraudulent documents, including fraudulent liability insurance certificates and invoices, which the contractors could use to disguise the transactions as payments for materials and/or subcontracting work if the customers were audited by the New York State Workers Compensation Board or tax authorities.

6. The defendant DAVID MOTOVICH created companies that did not provide any legitimate products or services, but which were created for the sole purpose of facilitating his illegal check cashing business (the "Shell Companies"). MOTOVICH instructed his customers to issue checks drawn against a customer business account and to make the checks payable to one of the Shell Companies MOTOVICH had created or to give MOTOVICH blank checks and permit him to make the checks payable to one of the Shell Companies.

7. During the course of the investigation, I and other law enforcement agents have interviewed two operators of building construction companies who cashed checks at the

defendant DAVID MOTOVICH's illegal check cashing business, and who are both cooperating with the government's investigation ("Cooperating Witness 1" and "Cooperating Witness 2").[2]

    a.    <u>Cooperating Witness 1</u>

8.    Cooperating Witness 1, in sum and substance and in part, has told law enforcement agents that for a period of several years beginning at least as early as January 2012 through 2019, he/she would obtain cash from the defendant DAVID MOTOVICH in the following manner. First, MOTOVICH would instruct Cooperating Witness 1 to issue checks drawn against Cooperating Witness 1's business account to several different companies, the names of which MOTOVICH provided to Cooperating Witness 1. On occasion, MOTOVICH instructed Cooperating Witness 1 to leave the payee line blank because MOTOVICH had not yet created the company or decided which company to use. In exchange for the check, MOTOVICH provided Cooperating Witness 1 with cash, which MOTOVICH kept in a hidden room at the Lumber Company, in an amount equal to the face amount of the check minus a fee of four to six percent. Cooperating Witness 1 stated that he/she agreed to pay the higher fee charged by MOTOVICH (instead of going to a licensed check cashing business and paying a lower fee) because he/she understood that MOTOVICH would not file a CTR when Cooperating Witness 1 cashed a check in an amount greater than $10,000.

9.    Cooperating Witness 1 further stated that the defendant DAVID MOTOVICH provided Cooperating Witness 1 with workers compensation insurance certificates issued to the companies to whom Cooperating Witness 1 had written the checks. The insurance

---

[2] Cooperating Witnesses 1 and 2 have both pleaded guilty, pursuant to cooperation agreements with the government, to informations charging them with payroll tax evasion, in violation of Title 26, United States Code, Section 7202. Cooperating Witnesses 1 and 2 are cooperating with the government in the hopes of receiving a lenient sentence.

certificates were meant to assist in making it appear that the checks that Cooperating Witness 1 issued were payments for sub-contracting services. Cooperating Witness 1 told agents that in the event his/her company was audited by the New York State Workers Compensation Board, he/she would provide the insurance certificates to the auditors as proof that his/her company's purported sub-contractors had adequate workers compensation insurance. I have reviewed copies of some of the insurance certificates that Cooperating Witness 1 received from MOTOVICH, and I and other law enforcement agents have interviewed the insurance broker who purportedly issued the certificates (the "Broker"). The Broker told agents that the insurance certificates were fraudulent and indicated, among other things, that his/her brokerage agency had not issued the certificates, his/her signature had been forged on the certificates and the companies to whom the certificates were purportedly issued were never clients of his/her agency.

10. Based on my training and experience and my knowledge of the investigation, including my discussions with Cooperating Witness 1 and my review of bank records and other financial documents, I am aware that between 2012 and 2019, Cooperating Witness 1 issued checks totaling approximately $3 million to the various Shell Companies in exchange for that amount of cash from the defendant DAVID MOTOVICH minus MOTOVICH's fee.

    b.    <u>Cooperating Witness 2</u>

11. Cooperating Witness 2, in sum and substance and in part, told law enforcement agents that he/she regularly issued checks drawn against his business account to several different companies, the names of which the defendant DAVID MOTOVICH provided to Cooperating Witness 2, in exchange for an equal amount of cash from MOTOVICH, minus a fee

of ten percent charged by MOTOVICH. Based on my review of bank account records, I am aware that between 2012 and 2019, Cooperating Witness 2 issued checks totaling more than $1.3 million to the Shell Companies in exchange for that amount of cash from MOTOVICH minus MOTOVICH's fee.

      c.    <u>Shell Company Bank Accounts</u>

      12.    Based on my knowledge of the investigation, including my review of bank records and interviews of witnesses, I am aware that once in possession of the checks that Cooperating Witnesses 1 and 2 as well as other building contractors issued to the Shell Companies, the defendant DAVID MOTOVICH deposited the checks into bank accounts in the names of the Shell Companies that he had opened at several financial institutions (the "Shell Company Bank Accounts"). I am further aware that to conceal his control and ownership of the funds in the Shell Company Bank Accounts, and to avoid detection of his scheme, MOTOVICH opened the Shell Company Bank Accounts in the names of at least three other individuals, including John Doe 1.

      13.    For example, on or about April 1, 2016, the defendant DAVID MOTOVICH opened a Shell Company bank account at a bank branch located in Brooklyn ("Bank 1") in John Doe 1's name. In the account opening application, MOTOVICH caused one of his associates ("Co-Conspirator 1") to list John Doe 1 as the president and one-hundred percent owner of the Shell Company and as the sole authorized signatory on the bank account. In support of the application, Co-conspirator 1 emailed a copy of the Shell Company's articles of incorporation, which he/she had filed with the State of New York just four days earlier, as well as copies of John Doe 1's driver license and Social Security card, to a branch manager at Bank 1.

14. The bank branch manager is an individual who is cooperating with the government's investigation ("Cooperating Witness 3").[3] Cooperating Witness 3, in sum and substance and in part, has told agents that although John Doe 1's name and other personal identifying information was used to open the account and although John Doe 1 was listed as the sole authorized signatory on the account, Cooperating Witness 3 would only effectuate transactions in the account, including all wire transfers in and out of the account, as directed by the defendant DAVID MOTOVICH or Co-conspirator 1.

15. Law enforcement agents have also spoken to a compliance officer employed by Bank 1 (the "Compliance Officer"). The Compliance Officer, in sum and substance and in part, has told agents that before a bank account is opened, the individual opening the account must present personal identification and documents demonstrating his/her control or ownership of the company in whose name the account is to be opened, so that the bank knows the true identity of the individual who will be controlling transactions in the account. The Compliance Officer further stated that bank employees are not permitted to conduct transactions for individuals who are not listed as signatories on the account and that those employees who do so put the bank at risk of facilitating criminal conduct, including fraud and money laundering. Further, the Compliance Officer stated that the bank does not open accounts for individuals engaged in a check cashing business because of the high risk of fraud or money laundering conduct associated with check cashing businesses.

---

[3] Cooperating Witness 3 is expected to plead guilty, pursuant to a cooperation agreement with the government, on August 23, 2021, to an information charging him/her with bank fraud, in violation of Title 18, United States Code, Section 1344, and is cooperating with the government in the hopes of receiving a lenient sentence.

16. During the course of the investigation, I and other law enforcement agents interviewed John Doe 1. John Doe 1, who was previously homeless and was working as a store clerk at the time of the interview, indicated in sum and substance and in part that he/she did not know the defendant DAVID MOTOVICH, never gave MOTOVICH permission to open a bank account in John Doe 1's name and had never opened an account at Bank 1. The investigation has revealed that between April 2016 and December 2017, MOTOVICH deposited more than $9.6 million into the shell bank account that he opened in John Doe 1's name.

17. In total, based on my review of bank records and interviews with witnesses, I am aware that between 2012 and 2019, the defendant DAVID MOTOVICH deposited more than $55 million into the Shell Company Bank Accounts that he had opened in the names of John Doe 1 and other individuals. I am further aware that MOTOVICH used the funds deposited into the Shell Company Bank Accounts to, among other things: purchase real estate properties; pay personal and corporate credit card accounts; purchase luxury items, including millions of dollars of diamonds, watches, jewelry and clothing from high-end retail stores such as Bloomingdales, Hermes, Neiman Marcus and Saks Fifth Avenue; make lease and purchase payments for Porsche and Lexus luxury vehicles; pay premiums on multi-million dollar life insurance policies for himself, his wife and others; make renovations to his penthouse apartment; and to fund other business ventures, including a hard-money lending business.

II. The Defendant DAVID MOTOVICH's Attempts to Tamper with Witnesses

18. Based on my knowledge of the investigation, I am further aware that the defendant DAVID MOTOVICH has attempted to interfere with the government's investigation by, among other conduct, tampering with potential witnesses against him, including by

encouraging those individuals not to cooperate with law enforcement and to instead retain defense attorneys that MOTOVICH chooses for them.

19. For example, on or about January 12, 2019, federal law enforcement agents interviewed an associate of the defendant DAVID MOTOVICH's ("Co-conspirator 2"). Co-conspirator 2 is one of the individuals in whose name MOTOVICH opened several of the Shell Company Bank Accounts. During the interview, Co-conspirator 2, in sum and substance and in part, told agents that he had opened several of the Shell Company Bank Accounts at MOTOVICH's direction, that he gave MOTOVICH the check books associated with the accounts and that MOTOVICH controlled all the transactions in the accounts. Co-conspirator 2 also told agents that he wanted to cooperate with law enforcement and agreed to meet with agents later that week.

20. I am aware that two days later, however, the defendant DAVID MOTOVICH issued a check in the amount of $50,000 from one of the Shell Company Bank Accounts to an attorney, who, later that day, informed prosecutors assigned to the investigation that Co-conspirator 2 had decided not to meet with agents. I am further aware that beginning two weeks later, on or about February 1, 2019, MOTOVICH issued checks to Co-conspirator 2 and to two of Co-conspirator 2's children in amounts totaling $26,810, and that several of the checks contained the term "payroll" in the memo line. Based on my review of nearly seven years' worth of the records of bank accounts controlled by MOTOVICH, I am aware that this was the first time that MOTOVICH had issued a check to any of Co-conspirator 2's children, and the first time that he had issued a check to Co-conspirator 2 with the term "payroll" in the memo line. Based on my knowledge of the investigation, I believe that MOTOVICH issued the "payroll" checks to Co-conspirator 2 and to his children to: (1) make it appear to law

enforcement agents reviewing his bank accounts that the Shell Company was a legitimate business with employees (which it is not); and (2) compensate Co-Conspirator 2 for his agreeing not to cooperate with law enforcement.

21. I am further aware that the defendant DAVID MOTOVICH has attempted to convince other witnesses not to cooperate with law enforcement. For example, in a conversation that Cooperating Witness 1 consensually recorded on or about June 5, 2019, MOTOVICH and Cooperating Witness 1 had the following exchange, in relevant part:[4]

| | |
|---|---|
| MOTOVICH: | Why did they subpoena you? They subpoena everybody. Everybody. And obviously they got me, one of the guys (pause) got picked up. But I took care of it. I could tell you who it is. But [U/I] I can tell you this in front of a normal attorney. What I can't tell you is. (Pause) This is obstruction of justice. Its throw them in jail. No joke. You need to get a fucking normal attorney. I don't know why you would pay . . . If . . . If . . . Shit happens you come to me right in the beginning. Everybody came to me. Only you and the painter didn't come. But listen to me. You didn't know this, I understand . . . But listen they want you to believe. |
| CW 1: | And they said . . . |
| MOTOVICH: | Shhh. They want you to lose it. You know why? When you lose it they have you. When you lose it they have you. I need to [U/I] today. Let me know where to text you. Get a different attorney so we can sit. Maybe you just go see him. His name is [Name of attorney]. I'll have [name of MOTOVICH's attorney] call him. He's going to call your attorney and tell them that they are fired and all the paperwork that he has should transfer to him. And then me, you and him will sit in one room. |

****

| | |
|---|---|
| MOTOVICH: | If he doesn't want to cooperate with my attorney. Who is the lead attorney cause we talked to everybody. We have |

---

[4] The transcription of the recording is in draft form and is subject to revision.

|  |  |
|---|---|
|  | spoken to those people across.   Your attorney doesn't have any information.   He is never going to be the lead attorney.   You need to fire him.   You need to listen to me. |
| CW 1: | I will have to sit down with them and see what uh [U/I] |
| MOTOVICH: | Where did they get this bullshit?   Tell me. |
| CW 1: | I don't know.   They called me to go down.   What about you? |
| MOTOVICH: | Shhh.   You need to talk with my … we need to get you another.   You can have a second attorney. |

****

| | |
|---|---|
| MOTOVICH: | You are not listening to me.   Listen to me. The whole group [U/I].   The same problems you have, nobody has.   You listen and I hope you are going to be ok.   Because if it's a whole group (pause) everybody has to join the group.   Otherwise they don't know if you are turning into a rat.   Then there is going to be an issue. [Pause] They have nothing.   We are all legitimate people.   We are all business people.   We work hard.   We pay taxes. |
| CW 1: | [U/I] IRS and that guy is uh … |
| MOTOVICH: | Shhh.   Listen, you are going to be calmer.   You are going to think of me.   You want sleep better at night? |
| CW 1: | No, I don't sleep. |
| MOTOVICH: | I know. So |
| CW 1: | [U/I] |
| MOTOVICH: | Shhh.   Do you want to sleep?   If you really want to sleep |
| CW 1: | [U/I] |
| MOTOVICH: | Shhh. Listen to me. |
| CW 1: | [U/I] |
| MOTOVICH: | No listen to me. |
| CW 1: | They don't talk to me. [U/I] |

| | |
|---|---|
| MOTOVICH: | Shhh. You asked my advice. [U/I] So I believe like this. [U/I] Find another person so we can all sit in a room together. If you take one of these other attorneys. Just for your peace of mind, to give them a retainer of $5,000, believe me you are going to go to sleep. Then I can show you everything. I cannot show you anything unless we have a total defense together. I am going to go see him today. And I will call you from his office. It will be a 212 number or 646 so pick up if you don't recognize. It will be between 5 and 6. And we will talk to you together. My lawyer, he knows what to say. When I come correct with everything, believe me, relax. |
| CW 1: | I relax. [U/I] |
| MOTOVICH: | Listen, listen, listen. A lot of people this other guy who just fell. They pinched 31 million. 31 million. He paid 700,000. I am happy they want money. I have another another guy that cashed 90. Nothing illegal anymore. |
| CW 1: | How much I [U/I] |
| MOTOVICH: | Nothing, nothing, nothing. You need to sit with the attorneys and I will explain to you. Then you are going to go home and relax. |
| CW 1: | My lawyers and |
| MOTOVICH: | Shhh. Don't, this is your lawyer. |
| CW 1: | after [U/I] |
| MOTOVICH: | This is your lawyer. Shhh. Shhh. Listen, listen, you need to sit with my attorney. Trust me. [U/I] your lawyer is not going to cost you 700,000. You have to . . . hey they are professional robbers. I am telling you. If you think I will . . . we need to meeting. We need a meeting. I am going to call you today with him and then we can talk and go from there. |

Based on my knowledge of the investigation, I believe that in this exchange, MOTOVICH is confirming that he paid for an attorney for Co-conspirator 1 after he was interviewed by agents and that Co-conspirator 1 was not cooperating with law enforcement ("Why did they subpoena

you? They subpoena everybody. Everybody. And obviously they got me, one of the guys (pause) got picked up. But I took care of it."). I further believe that MOTOVICH was trying to convince Cooperating Witness 1 to retain a lawyer that MOTOVICH had chosen for Cooperating Witness 1 to ensure that he/she did not cooperate with law enforcement because MOTOVICH's lawyer, and not Cooperating Witness 1's lawyer, would be the "lead lawyer" in protecting them against the government's investigation ("I'll have [name of MOTOVICH's attorney] call him. He's going to call your attorney and tell them that they are fired and all the paperwork that he has should transfer to him" and "Your attorney doesn't have any information. He is never going to be the lead attorney. You need to fire him. You need to listen to me."). I further believe that MOTOVICH was trying to convince Cooperating Witness 1 not to cooperate with law enforcement by suggesting that if Cooperating Witness 1 did not go along with MOTOVICH and the other individuals for whom MOTOVICH had already obtained attorneys, MOTOVICH would view Cooperating Witness 1 as a "rat" and that his/her being a "rat" would be an "issue" for Cooperating Witness 1.

WHEREFORE, your deponent respectfully requests an arrest warrant issue so that the defendant DAVID MOTOVICH be dealt with according to law.

It is further requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and arrest warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation and, based upon my training and experience, I have learned that criminals actively search for criminal affidavits and warrants via the internet, and disseminate them to others as they deem appropriate, e.g., by posting them publicly online. Premature disclosure of

the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

*Christopher Cabane*
_____
Christopher J. Cabane
Special Agent, Internal Revenue Service

Sworn to before me by telephone this
20th day of August, 2021

*Marcia M. Henry*
_____
THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK