

U.S. Department of Justice

United States Attorney
Eastern District of New York

RTP
F. #2019R00033

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 28, 2024

By ECF

The Honorable William F. Kuntz II
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Motovich et al, 21-CR-497 (WFK)

Dear Judge Kuntz:

        The government respectfully submits this letter in further support of its opposition to the defendant David Motovich's motions to: (1) dismiss Counts Three through Seven (the "Bank Fraud Counts") and Sixteen (the "Aggravated Identity Theft Count") of the Indictment for failure to state an offense (see ECF No. 182 ("Def.'s MTD Mem.")); and (2) suppress evidence seized pursuant to two judicially-authorized search warrants (see ECF No. 184).[1]

    I.    The Court Should Reject the Defendant's Motion to Dismiss

        In his moving papers, Motovich advanced several arguments as to why the Court must dismiss the Bank Fraud and Aggravated Identity Theft Counts. However, based on the March 21, 2024 oral argument, he now primarily seems to argue that the Bank Fraud Counts should be dismissed because the government impermissibly relies on the "right-to-control" theory of wire fraud that the Supreme Court rejected in Ciminelli v. United States, 598 U.S. 306 (2023). Under the rejected right-to-control theory, a defendant could commit wire fraud if "he scheme[d] to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions." Id. at 309. In Ciminelli, the Supreme Court held that this theory of fraud was inconsistent with the wire fraud statute, which requires that the government

---

[1] For all issues raised by the defense in their motions, the government rests on its initial opposition to Motovich's motions and arguments made at oral argument. (ECF No. 194 ("Gov. Resp.")).

prove that the defendant had engaged in a deception and that the object of his fraud was money or property. Id. at 312-14.

The fatal flaw in Motovich's argument, however, is that the Indictment does not allege a right-to-control theory (or charge wire fraud, for that matter). That phrase is nowhere to be found in the Indictment. Rather, the Indictment clearly alleges that Motovich engaged in deception, (see e.g., ECF No. 19 (the "Indict.") at ¶ 16 ("when opening the Shell Company Bank Accounts and while each such account was open, the defendants David Motovich and Marina Kuyan made numerous materially false representations to each of the Banks, including falsely representing the identity of the accounts' beneficial ownership, the nature of the Shell Companies' businesses and the business rationales for certain transactions")), and that the object of his deception was the taking of bank property, (see e.g., Count Three of Ind. ("Motovich, Kuyan and Markovics, together with others, . . . did knowingly and intentionally execute schemes to defraud [Bank 1], and to obtain moneys, funds, credits and other property owned by, and under the custody and control, of such financial institution[] by means of materially false and fraudulent pretenses, representations and promises.")).

Nor will the government advance a right-to-control theory of fraud at trial. As the government made clear in its opposition papers and at oral argument, the trial evidence will establish that Motovich engaged in deception and that the object of his deception was bank property. (See e.g., Gov. Resp. at 34 ("The Indictment alleges, and the trial evidence will show, that each and every time Motovich deposited, withdrew or transferred funds from the bank accounts, he (1) misidentified himself to the banks as either John Doe 1 or one of the other individuals in whose name he had opened the Shell Company bank accounts, and (2) misrepresented that the funds were legitimate and for companies providing actual services. These misrepresentations were the immediate cause for the banks to accept the funds and to then subsequently relinquish their property rights in them. Indeed, the Indictment alleges and the trial evidence will establish that Motovich bribed a bank officer, so that he could effectuate transactions in the bank account associated with the ZKC Shell Company because Motovich falsely told Carver Bank that John Doe 1 was the sole authorized signatory and owner of the account.").

Against this backdrop, Motovich at oral argument attempted to recast the Indictment's allegations that set forth a clear, straightforward traditional theory of property fraud, by wrongly insisting that (1) he owned the funds deposited into the accounts; (2) the deposits he made into the bank accounts are therefore not property of the banks; and (3) that, even if he deceived the banks, his deception merely deprived the banks of accurate information. These arguments are not correct. Nor are they novel. As the government argued at the March 21 oral argument, it is black-letter law that the entities recognized by the banks as the depositor of the funds are the sham LLCs that Motovich created for the purpose of defrauding the banks. See e.g., Scott v. Branch Banking and Trust Co., 585 F. Supp. 2d 667, 672-673 (W.D.V.A. 2008) (noting that a bank has a contractual relationship only with its depositor LLC and owner of LLC and not with any third-party, even if third-party had deposited funds into account). Motovich lied to the banks when he told them that the sham LLCs were legitimate construction businesses and that they were owned by other individuals. Motovich's name does not appear on any of the account opening documents. The funds deposited into the sham LLC bank accounts did not in any way "belong" to Motovich as far as the defrauded banks were concerned. Moreover, as the

government argued at the March 21 oral argument and detailed in its opposition brief, it is black-letter law that funds deposited into bank accounts are the property of the banks. Any arguments to the contrary are unequivocally false. At trial, the government expects to call witnesses from one or more banks who will explain why Motovich's false representations were material.

Furthermore, as for Motovich's argument that the Indictment alleges a right to control theory of fraud, case law is replete with examples of defendants post-Ciminelli who, like Motovich here, have tried to recast allegations in indictments detailing traditional property fraud schemes into purported right-to-control fraud schemes. Courts have uniformly and rightly rejected this tactic without any difficulty. The Court should do the same here.

Take, for example, the Honorable Jed S. Rakoff's decision in United States v. Weigand, 482 F. Supp. 3d 224 (S.D.N.Y. 2020), a decision that both parties relied on in their briefing. There, the defendant argued that the bank fraud charge against him should be dismissed because the only bank property at stake was the bank's right to the "ethereal right to accurate information." Id. at 236. As the government noted in its opposition brief, Judge Rakoff summarily rejected this argument, noting that:

> Here, by contrast, the object of the alleged scheme was money. The banks had concrete property interests in these funds, and defendants allegedly sought to injure those interests by causing the banks to relinquish those funds through deception. Thus, the indictment sufficiently stated an intent to harm their property interests; whether the banks also had a 'right to accurate information,' 'etheral' or otherwise, is besides the point.

Id. at 236-237; (Gov. Resp. at 35-36).

In United States v. Griffin, 76 F.4th 724 (7th Cir. 2023), the Seventh Circuit rejected a similar argument in affirming a wire fraud conviction. The defendant argued that Ciminelli required that his conviction be vacated because the government "chose to pursue a 'right to control' theory of money or property fraud … namely, 'that the [Small Business Administration] has a property interest in making sure that its rules are followed." Id. at 737-38. The Seventh Circuit rejected this argument, noting that the trial record, including the allegations in the indictment, the government's opening and closing statements, the trial evidence, and the jury instructions "makes clear that the Government' case is grounded in the defendants' use of false representations to obtain loan guarantees from the SBA that would not have been granted if the true facts had been made known. These guarantees . . . are most certainly 'property' as required by the wire fraud statute." Id. at 739. In so holding, the Seventh Circuit gave short shrift to the defendants' attempt to recast the government's theory as merely a right-to-control theory simply because the government had argued that the SBA guarantee "is the SBA's right to manage its funds and guard against the risk of loss." Id.

In United States v. Runner, 18-CR-578 (JS), 2023 WL 3727532 (E.D.N.Y. May 30, 2023), Judge Seybert rejected the defendant's attempt to preclude the government from introducing evidence that the defendant "defrauded his customers merely by depriving them of material information." Id. at *2. Judge Seybert, noting that the government's charging theory

3

was not based on the victim's property rights to information, rejected the motion: "[d]efendant cannot use Ciminelli as a shield to prevent the Government from introducing the misrepresentations or omissions underlying the alleged scheme to defraud under the guise of construing those same deceptions as exclusively relevant to a victim's property interest to 'mere information' to render them actionable." Id. Judge Seybert expressly permitted the government to offer evidence that the victims were deprived of material information as part of defendant's scheme to deceive them and obtain their property. Id.

In United States v. Mansouri, 22-CR-34 (LJV) (MJR), 2023 WL 8430239 (W.D.N.Y. Dec. 5, 2023), the district court denied the defendant's motion to dismiss wire and bank fraud charges. The court found that Ciminelli did not warrant dismissal because the indictment did not allege a right-to-control fraud theory. The indictment alleged, among other things, that the defendant had created several LLCs, several of which had no employees or payroll expenses, for the purpose of defrauding the SBA in connection with obtaining loans and that the lenders relied on misrepresentations submitted in loan applications when deciding whether to make loans. The district court found that the indictment said nothing about depriving the SBA about its "right to control property" and that the government's theory was that "the object of Mansouri's fraud in this case was the money belonging to the financial lenders and the SBA and the applications containing material misrepresentations were the means Mansouri used to deprive the lenders and the SBA of their money and property." Id. at *3 (internal punctation and quotation marks omitted).

In United States v. Bankman-Fried, ---- F. Supp. 3d ----, 22-CR-673 (LAK), 2023 WL 4194773 (S.D.N.Y. June 27, 2023), Judge Kaplan found without merit the defendant's argument that the bank fraud charges should be dismissed because of Ciminelli. Judge Kaplan first noted that, like the Indictment in this case, there, the bank fraud count tracked the statutory language of Section 1344 of Title 18 and sufficiently alleged that the defendant conspired to obtain "money or property" in violation of the statute. Id. at *8. Judge Kaplan further noted that "Ciminelli is inapposite because the [i]ndictment alleges that the defendant conspired to induce a bank to open an account, which was used to receive FTX customer deposits and from which the defendant and his conspirators 'regularly took money' from the bank's custody. Id. Because the indictment had "plainly allege[d] a scheme to obtain 'money or property,' not a scheme to deprive a bank of 'valuable economic information,'" Judge Kaplan denied the motion to dismiss. Id.

In United States v. Pierre, 22-CR-20 (PGG), 2023 WL 4493511 (S.D.N.Y. July 12, 2023), the defendant argued that healthcare fraud charges should be dismissed because Ciminelli, among other reasons, "confirms that deceit which merely deprives the victim of its right to withhold payment or otherwise control its assets is not federal fraud." Id. at *15. Judge Gardephe denied the motion because the indictment did not mention the right-to-control theory of fraud, the government had not relied on it in its briefing and Ciminelli itself left open the possibility whether the government's evidence in that case could have supported a conviction for fraudulently obtaining the contract themselves, rather than depriving the victim of valuable economic information for deciding to whom the contracts would be awarded. Id.

In United States v. Aronov, 19-CR-408 (MKB), 2024 WL 554577 (E.D.N.Y. Feb. 12, 2024), Chief Judge Brodie denied the defendants' motion to dismiss the indictment charging

4

conspiracy and substantive wire and bank fraud, noting that the indictment does not allege a right to control theory of fraud and rejecting the defendants' attempts to recast the indictment as one alleging that the defendants' scheme to defraud solely deprived the victim of valuable economic information needed to make discretionary economic decisions. Id. at *3.

These cases, and others, all make clear that Motovich is simply setting up a straw man argument: he distorts the allegations in the Indictment to fit his narrative and then argues that the fraud charges must be dismissed. The Court should reject his attempts to recast the government's fraud theory, deny his motion to dismiss the indictment, and permit a jury to decide whether the government has met its burden on all counts.

II. The Court Should Deny the Defendant's Motion to Suppress Evidence

As the government neither notified the Court and defense counsel at the March 21 conference, the government does not expect to call any witnesses at the upcoming hearing on April 2, 2024, to show that the two search warrants at issue (referred to in the government's initial opposition papers as the Midwood Warrant and iCloud Warrant (collectively, the "Warrants")) were proper, properly relied upon and executed. As the Court indicated would be acceptable, the government intends to rely on documentary evidence as exhibits for its arguments.

Despite it being the government's decision as to its witnesses, yesterday, the defense asked that the government "make available" a series of individuals, half of whom are civilians and co-conspirators of Motovich and were not involved in the process of requesting or executing either Warrant. The defendant's request reveals the game they have been playing all along: request a hearing under the guise of challenging plainly valid warrants so they can attempt to learn of witness statements and cross examine those witnesses before trial. The government has reiterated to defense counsel, as the Court also implied would be the proper course at the conference, that the defense can go through the proper channels of seeking testimony of various witnesses. Although, especially at this late hour, the government would likely oppose.

Briefly, as background, and as thoroughly detailed in the government's opposition papers, the Warrants were particularized. The Second Circuit has specified three components of the particularity requirement: (1) the "warrant must identify the specific offense for which the [investigators] have identified probable cause"; (2) the "warrant must describe the place to be searched"; and (3) the "warrant must specify the 'items to be searched by their relation to designated crimes.'" United States v. Galpin, 720 F.3d 436, 445 (2d Cir. 2013) (citation omitted). As is standard, the government intends to demonstrate particularity from the face of the Warrants to be submitted as evidence. See United States v. Daskal, 676 F. Supp. 3d 153 (NGG) (E.D.N.Y. 2023) ("The court will conduct its own analysis to determine whether the New York Phone Warrant was valid on its face," and finding that the warrant met the Second Circuit's three-prong particularity test). Here, the government will make clear how at the forthcoming hearing the Warrants were plainly particularized.

Furthermore, neither Warrant was overbroad. "An otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." Galpin, 720 F.3d at 446. Again, the

government intends to demonstrate that the Warrants' seizure categories are coextensive with the allegations in the supporting affidavits by relying on the documentary record, as is standard. See Daskal, 676 F. Supp. 3d at 153 (ruling that warrant was not overbroad based on a review of the warrant and supporting materials).

Assuming that the Warrants were facially invalid (i.e., unparticularized or overbroad), the good faith exception would operate to prevent exclusion. United States v. Leon, 468 U.S. 897, 906 (1984). As relevant here, in regards to overbreadth, the good faith exception can cure deficiencies except where probable cause is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923. "Such a concern most frequently arises when affidavits are bare bones, i.e., totally devoid of factual circumstances to support conclusory allegations." United States v. Clark, 638 F.3d 89, 103 (2d Cir. 2011). Although the government does not believe it is needed in this case, the government can easily show from the documentary record that, even if the affidavits supporting the Warrants did not contain sufficient detail to provide probable cause for the full breadth of the Warrants, they "undoubtedly contain sufficient probable cause to save" the Warrants "for good faith purposes." Daskal, 676 F. Supp. 3d at 153 (finding that based on the warrant and supporting materials that "a reasonable officer could have easily believed that the New York Phones Warrant complied with the constitutional particularity requirement," and that the "warrant also identified the specific offense for which the police had established probable cause, described the place to be searched, and specified the items to be seized by their relation to designated crimes.") (internal citations omitted).

Finally, a "search is presumptively reasonable when executed pursuant to a warrant," and a "search warrant issued by a neutral magistrate, upon a finding of probable cause, must be afforded great deference and creates a presumption that the officers executing the warrant acted in an objectively reasonable fashion." Merriweather v. City of New York, No. 12-CV-5258 (KPF), 2015 WL 57399, at *6 (S.D.N.Y. Jan. 5, 2015). As the Second Circuit stated in United States v. Ganias, "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness." 824 F.3d 199, 210 (2d Cir. 2016) (quoting Leon, 468 U.S. at 922 (alteration omitted) (quoting Gates, 462 U.S. at 267 (White, J., concurring))). "Where the executing agents exceed the warrant's authority in the search of their scope, 'the normal remedy is suppression and return of those items, not invalidation of the entire search." United States v. Matias, 836 F.2d 744, 747 (2d Cir. 1988). Here, the government expects to show through the documentary record that the items challenged as outside the scope of the warrant were either in fact responsive (fall within the Warrants' seizure categories) or the government does not intend to use them at trial. In such situations, as the Honorable Alison J. Nathan outlined in United States v. Nejad, 436 F. Supp. 3d 707 (S.D.N.Y. 2020), the matter was moot as to certain unresponsive items since the government stated it would not use them at trial, id. at 736, and

> with respect to the categories of pages the Court is able to rule on at this juncture, the Court concludes that it need not hold an evidentiary hearing and decides Sadr's suppression motion on the papers. See United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005) ("[A]n evidentiary hearing on a motion to suppress ordinarily is [not] required [unless] 'the moving papers are sufficiently definite,

6

specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" (citation omitted)).

Id. at 738.  The district court further recited the following:

> Sadr further argues that the fact that allegedly irrelevant documents were marked responsive "confirms that the search warrants imposed no limits." Dkt. No. 156 at 12–14. As discussed above, though he frames this argument as supporting the invalidity of the warrants themselves due to a lack of particularity, the argument actually bears on whether the search warrants were executed in a reasonable manner.  Indeed, Sadr admitted as much at the November 25, 2019 oral argument on this motion.  See Dkt. No. 173 at 46:25–47:6.
>
> The Court considers the entirety of the universe of documents deemed responsive in determining whether the responsiveness review was conducted reasonably.  In doing so, it does not find the allegedly irrelevant documents Sadr cites as compelling the conclusion that the review was unreasonable.  The fact that the Government ultimately tagged as responsive fewer than 3,000 documents from a review population of over one million documents indicates that the review was reasonable[.]
>
> . . .
>
> That some much smaller number of the 3,000 documents the Government seized may be irrelevant is not, on its own, sufficient to establish that the responsiveness review was unreasonable.

Id. at 735.  At Tuesday's hearing, the government intends to demonstrate for the Court, in reliance on the record, similar facts.

Respectfully submitted,

BREON PEACE
United States Attorney

By:  /s/
Robert Polemeni
Erik Paulsen
Andrew Grubin
Assistant U.S. Attorneys
(718) 254-7000

Cc: Clerk of the Court (WFK)
    All counsel (by ECF)

7