

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RTP:EDP/ADG/MS
F. #2019R00033

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 9, 2024

<u>By ECF</u>

The Honorable William F. Kuntz II
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  <u>United States v. Motovich et al, 21-CR-497 (WFK)</u>

Dear Judge Kuntz:

    The government respectfully submits this letter in further opposition to the defendant David Motovich's motion to suppress evidence seized pursuant to two judicially-authorized search warrants (<u>see</u> ECF No. 184). For the reasons stated in the government's prior briefings (ECF Nos. 194 ("Gov. Resp.") & 217 ("Gov. Supp.")) and during argument on April 2, 2024, both the Midwood Lumber Warrant and iCloud Warrant (collectively, "the Warrants") are plainly particularized and not unconstitutionally overbroad. After months of litigation on the matter, the defendant still has not pointed to a specific defect in either Warrant. Moreover, assuming <u>arguendo</u> that the defense could identify such a defect, it is not remotely evident that "a reasonable well-trained officer would have known that the search was illegal despite the magistrate's authorization." <u>United States v. Burke</u>, 718 F. Supp. 1130, 1141 (S.D.N.Y. 1989) (<u>quoting</u> <u>United States v. Leon</u>, 468 U.S. 897, 914 (1984) (summarizing <u>Leon</u>'s objective good faith exception and the "only" four situations in which evidence seized can be suppressed)).

    To be clear, these issues—particularity, overbreadth and good faith—were the primary issues litigated by the parties in their briefings and argued at Court proceedings. In its briefing and in oral argument before the Court, the government methodically went through the legal tests for each issue and applied them to the instant facts. For example, the government applied the Second Circuit's three-prong test for whether a warrant is sufficiently particularized to the Warrants here, an analysis in which the defense has yet to engage. On these issues underlying the defendant's initial motion to suppress, the defendants' arguments are frivolous; their cases are plainly inapposite; and their arguments conflate various standards and ignore legal tests. The government rests on its extensive prior briefing and oral arguments on particularity, overbreadth and good faith, that is, the issues raised by the defendant's motion to suppress.

During oral argument, the defendant changed its emphasis, primarily arguing that the searches pursuant to the Warrants were so unreasonable that blanket suppression is necessary.[1] Again, the government begins with the legal standard. A "search is presumptively reasonable when executed pursuant to a warrant," and a "search warrant issued by a neutral magistrate, upon a finding of probable cause, must be afforded great deference and creates a presumption that the officers executing the warrant acted in an objectively reasonable fashion." Merriweather v. City of New York, No. 12-CV-5258 (KPF), 2015 WL 57399, at *6 (S.D.N.Y. Jan. 5, 2015). As the Second Circuit stated in United States v. Ganias, "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness." 824 F.3d 199, 210 (2d Cir. 2016) (quoting Leon, 468 U.S. at 922 (alteration and quotation omitted)). "Where the executing agents exceed the warrant's authority in the search of their scope, 'the normal remedy is suppression and return of those items, not invalidation of the entire search." United States v. Matias, 836 F.2d 744, 747 (2d Cir. 1988).

Thus, in the instant case, assuming arguendo that the 108 challenged documents seized from the Midwood Lumber computers and the 30 challenged images and videos seized from the defendant's iCloud account, which were attached as Exhibit F to the defendant's initial motion, are all nonresponsive,[2] the issue is nonetheless moot because the government has represented, and again now represents, that it does not intend to use any nonresponsive items at trial. See Matias, 836 F.2d at 747 ("[T]he normal remedy is suppression and return of those items, not invalidation of the entire search"); see also United States v. Rivera, 16-CR-175 (LGS), 2017 WL 1843302, at *1 (S.D.N.Y. May 8, 2017) (denying motions to suppress evidence recovered from cellphones as moot where government "represent[ed] that it d[id] not intend to offer such evidence at trial"); United States v. DiMarco, 12-CR-205 (RPP), 2013 WL 444764, at *13 (S.D.N.Y. Feb. 5, 2013) (same); United States v. Duran-Colon, 252 F. App'x 420, 422 (2d Cir. 2007) (observing that after defendant moved to suppress certain statements, "[t]he motion

---

[1] Despite the defendant's claim at the April 2 proceeding that this was his primary argument all along, his brief in support of his motion to suppress makes plain that his allegations concerning the seizure of nonresponsive items were used as support for his contention that the Warrants lacked particularity and were overbroad. Cf. United States v. Nejad, 436 F. Supp. 3d 707, 735-38 (S.D.N.Y. 2020) ("[The defendant] further argues that the fact that allegedly irrelevant documents were marked responsive 'confirms that the search warrants imposed no limits.' As discussed above, though he frames this argument as supporting the invalidity of the warrants themselves due to a lack of particularity, the argument actually bears on whether the search warrants were executed in a reasonable manner[,]" and the distinction is important due to the likely remedies).

[2] At the April 2 proceeding the defense introduced into evidence as its sole Defense Exhibit, 108 documents seized during the search of Midwood Lumber. As made plain during the April 2 proceeding, and as discussed further below, many if not most of the challenged items are in fact responsive to the Warrants. To the extent the government seeks to use an item the defense believes is outside the scope of either Warrant, the sensible course would be for the defense to object to its inclusion on the government's exhibit list and the item's responsiveness and relevance can be decided in advance of trial.

became moot as it related to the drug press statements when the government determined not to offer them").

It is clear what the defense is trying to do: have the Court order blanket suppression of the information seized during the searches of the Warrants under the guise that reviewing agents acted in bad faith. But it is evident that the defendant has not come forward with even a scintilla of actual evidence suggesting that the agents "executing the warrant acted in flagrant disregard of the warrant's terms" such that the "drastic remedy of the suppression of all the evidence seized" is justified. Matias, 836 F.2d at 747; see U.S. v. Shi Yan Liu, 239 F.3d 138 (2d Cir. 2000) (noting two-part test to determine whether there was flagrant disregard: (1) the agents must have effected a widespread seizure of items not within the scope of the warrant and (2) the agents did not act in good faith). Instead, he makes general, unsubstantiated and misleading assertions that the agents acted in bad faith and demands, by making the equally unsubstantiated assertion that it happens all the time in courts throughout the country, that he be given an opportunity to cross-examine government agents and civilian witnesses about how the agents executed their search.

But the case law is clear: a trial court need not hear witness testimony because it can dismiss a defendant's claim that agents acted in bad faith where it is evident based on the volume of materials seized that agents did not "effect a widespread seizure of items that were not within the scope of the warrant" (i.e., Shi Yan Liu's first prong). See Nejad, 436 F. Supp. 3d at 735 ("The Court considers the entirety of the universe of documents deemed responsive in determining whether the responsiveness review was conducted reasonably. . . . The fact that the Government ultimately tagged as responsive fewer than 3,000 documents from a review population of over one million documents indicates that the review was reasonable."); United States v. Garlick, 22-CR-540 (VEC), 2023 WL 2575664, at *11-12 (S.D.N.Y. Mar. 20, 2023) ("As a general matter, the Government marked only 156 pages, or about 2 percent, of the records produced in response to the Google Warrant responsive, suggesting that it did not engage in the type of general search that would require wholesale suppression[;]" and "the Government did not act in flagrant disregard of the terms of the Facebook Warrant. The Government marked as responsive only 26 pages or 1.3 percent of the material produced by Facebook[.]"); United States v. Triumph Capital Grp., Inc., 211 F.R.D. 31, 62 (D. Conn. 2022) (concluding that the government did not flagrantly disregard a search warrant's terms in part because it seized "only a comparatively small amount" of the defendant's data); United States v. Mendlowitz, No. 17-CR-248 (VSB), 2019 WL 1017533, at *13 (S.D.N.Y. Mar. 2, 2019) (concluding that the government did not flagrantly disregard a search warrant's terms in part because it identified "a modest collection" of 1,830 responsive documents); cf. United States v. Lumiere, 16-CR-483 2016 WL 7188149, at *4 (S.D.N.Y. Nov. 29, 2016) (holding that the Fourth Amendment does not require the government in a search of electronic materials to segregate evidence within the scope of the warrant from evidence outside the scope of the warrant, including marking documents responsive and not responsive); but see United States v. Pinto-Thomaz, 352 F. Supp. 3d 287, 309 (S.D.N.Y. 2018) (deciding to hear witness testimony on Shi Yan Liu's good faith prong where "143 photos and 146 text files" were inaccurately marked responsive, but deciding not to hold

hearing for other warrant where government stated only one item was inaccurately marked responsive).³

Here, as already proffered by the government and not disputed by the defense, for the Midwood Lumber search, in addition to searching physical documents, the government searched computers containing approximately 1,062,331 documents consisting of millions of pages. During its search, the government marked as responsive approximately 4,462 documents (that is, about 0.4% of the total number of documents contained in the files of the computers). This figure alone is sufficient to indicate that the government's execution of the warrant was reasonable. Nejad, 436 F. Supp. 3d at 735.

Recognizing as much, the defendant attempts to paint the search of the computers as done in bad faith by introducing into evidence a binder containing 108 documents that the defendant contends were improperly marked as responsive by seizing agents. Again, even assuming that the documents are in fact nonresponsive, the appropriate remedy, considering the small number of allegedly nonresponsive documents, is not blanket suppression of all evidence seized during the search but instead precluding the government from using the nonresponsive documents during trial. But the defendant does not even primarily identify nonresponsive documents; to the contrary, most of the documents the defendant claims are nonresponsive are, in fact, responsive to the Warrants. Although the Court need not analyze these materials document by document to properly resolve this motion, the government proffers the following to underscore the inaccuracy of the defendant's allegations in this matter.

For example, the defendant's admitted Document Numbers 1, 17, 18, 19, 22, 23, 25, 26, 32, 46, 47 and 48—all of which are emails attaching and discussing liability insurance certificates—are clearly responsive to the Warrants. The Affidavit in Support of Warrants to Search Midwood Lumber and Coney Island Payroll Services ("Gov. Hearing Ex. 2") summarizes the defendant's various schemes, and that as part of those schemes, "Motovich supplied his check cashing customers with fraudulent documents, including fraudulent liability insurance certificates and invoices." (Gov. Hearing Ex. 2 at ¶ 9; see also id. at ¶ 14 ("Cooperating Witness 1 further stated that Motovich provided Cooperating Witness 1 with workers compensation insurance certificates issued to the Shell Companies to which Cooperating Witness 1 had written the checks to make it appear that the checks that Cooperating Witness 1 had issued were payments for sub-contracting services."); ¶¶ 15-17 (further explaining defendant's use of fraudulent insurance certificates)). Indeed, the Midwood Warrant expressly permits the agents to

---

³ The defense relies heavily on the district court's opinion in Pinto-Thomaz, in requesting that the Court hear witness testimony. There, the district court held an evidentiary hearing to address several suppression issues, including one based on the defendant's allegation that agents had executed the search of the defendant's iCloud account in bad faith. The district court noted that the only reason why it had held the evidentiary hearing was because the "defendant had argued at length that [agents] deliberately violated the warrant's terms." 18-CR-579 (JSR) (S.D.N.Y. Feb. 20, 2019) (ECF No. 99 at 10 n.2). After holding the hearing, the district court concluded that the "allegation of bad faith is unsupported by any evidence in the record." Id.

4

seize "insurance certificates." (Gov Hearing Ex. 1 at Attach. B1(1)(a)). Thus, as clear from the government's hearing exhibits, agents were entirely justified in seizing the above-referenced documents because even if they are legitimate Midwood Lumber insurance certificates, their existence underscores the defendant's state of mind as to the crimes under investigation, e.g., his knowledge, intent, motive and access to insurance documents, when he used to create fraudulent insurance documents as part of his criminal schemes.

Take, as other examples, Defense Exhibit Document Numbers 9, 10, 11, 20, 24, 28, 29, 36, 39, 41, 42, 43 and 51. These documents all reference Midwood Lumber's cash balance (and in some documents the balances of a company called Pine Sash that was also controlled by the defendant) and demonstrate Midwood Lumber's access to or amount of cash on hand. The Midwood Lumber Affidavit is replete with allegations that Motovich operated a check cashing business from Midwood Lumber and that he obtained significant amounts of cash from Coney Island Payroll Services as well as from his Midwood Lumber customers, (see Gov. Hearing Ex. 2 at ¶¶ 23-25), and agents seized approximately $153,000 in cash during the search of Midwood Lumber pursuant to the express terms of the warrant, (see Gov. Hearing Ex. 1 at Attach. B1(1)(d)). In addition, these documents, as well as Document Numbers 13, 14, 15 and 16, identify companies and individuals that wrote checks to and received checks from the shell companies, including Neomy Dialysis, Unique Painting Services, Zorach Gobioff, Maidenberg Steel, Regency Glass, Royal Home Development (owned by co-defendant Joshua Markovics) and David Scharf, to name a few, (See e.g., Doc. No. 9 at Summary Aged Trial Balance), all of which constitutes evidence, fruits and instrumentalities of the crimes being investigated. (See Gov. Hearing Ex. 1 at Attach. B1(1)(a)-(g)). As the government has argued throughout these proceedings, Midwood Lumber was permeated with fraud.

As further examples, Document Numbers 50, 56, 57, 59, 61 and 62 are documents that Midwood Lumber received from Euler Hermes, a provider of trade insurance services. These documents are responsive because they indicate that Euler Hermes was billing Midwood Lumber for services provided to shell companies and companies that issue checks to the shell companies, including ZKC NY LLC, Royal Home Improvement, Maidenberg Corp., and Platinum Installations. Document Number 34 is for a hard-money lending business owned by the defendant. The document shows that the company owed $210,000 to the shell company ZKC and $200,000 to the shell company Midwood USA. This document relates to financial transactions involving the shell companies and are responsive. (See Gov. Hearing Ex. 1 at Attach. B1(1)(a)-(e)).

Document Numbers 27 and 49 are payroll reports for Midwood Lumber and Neomy Dialysis, which list several individuals on the company payrolls who also received checks totaling hundreds of thousands, if not millions of dollars, from the shell companies, including Roman Agabs, Abraham Fridman, Zorach Gobioff, Adiv ("Eddie") Madar, Gail Motovich, and Ezril ("Ed") Weingarten. These documents are responsive. (See Gov. Hearing Ex. 1 at Attach. B1(1)(a)-(g)).

Document Number 54 is an email attaching a quotation purportedly prepared by a company called IBAR Construction, yet another shell company created by the defendant. During the search of both Midwood Lumber and the defendant's residence, agents recovered blank but signed IBAR checks and the driver's license of the individual in whose name the

defendant had opened IBAR bank accounts.  In addition, agents recovered a credit card issued to IBAR from the handbag of the defendant's wife as she attempted to leave the residence during the search.  This document is responsive.

As for the relatively few documents that the government admits were mistakenly marked as responsive, the government reiterates that it will not use these documents at trial.  But the notion that agents acted in bad faith in marking the documents as responsive is preposterous.  Take, for example, Document Numbers 4-8, 70-78, 80, 81, 83, 87-108.   As explained during oral argument, Motovich named one of the shell companies he created CNBC Construction Corp. (see Gov. Hearing Ex. 1, Attach. B-1).  During the search, agents ran searches to identify potentially responsive documents, including searching for the term "CNBC," which is, of course, also the name of a popular media outlet.  These documents were marked responsive because they all contain a reference to the media outlet "CNBC."  Similarly, Documents 55 was marked responsive because it hit the term "SGS," which was the name of another shell company created by Motovich.  (See Ex. 1, Attach. B-1).  The lack of bad faith here is clear from the text of the documents themselves.

The search of the iCloud account presents similar circumstances.  The full iCloud report, which the government has previously provided to the defendant, consisted of approximately 154 GB of data, including communications, images, voicemails, videos and other items.  The government produced as responsive a fraction of the total data, less than 2.3 GB, consisting of thousands of highly incriminating SMS messages, iPhone instant messages and images that the defendant sent and received from several coconspirators, among other records.  The defendant claims approximately 30 images and videos are not within the scope of the Warrant.  Although the defendant, as explained at oral argument and below, incorrectly contends that certain information is nonresponsive where it is responsive, assuming he were correct, the Court can again conclude that there was no over-seizure based on the entirety of the universe of documents.

As with the Midwood Warrant, most of the images and videos seized from the iCloud account that the defendant contends are not responsive are, in fact, responsive.  For example, pages 3 and 4 of the defendant's Exhibit F[4] attached to its initial briefing are photographs of business cards for Bettina Schein and Alan Futerfas, both of whom represent co-defendant Joshua Markovics.  The government has produced in discovery a consensual recording that the individual identified as John Doe 2 in the Affidavit in Support of the Warrant to Search the defendant Motovich's iCloud account ("Gov. Hearing Ex. 4") made of co-defendant Markovics at the direction of law enforcement, in which Markovics urges John Doe 2 to contact Ms. Schein, so that she can talk with him about the government's investigation.  This recorded conversation occurred prior to agents obtaining the Warrant ("Gov. Hearing Ex. 3").  These pages are responsive to the iCloud Warrant in that they reveal the close relationship between Motovich and Markovics, particularly with respect to the crimes under investigation.

---

[4] Although the government produced these documents to the defendant with Bates-numbers, the defendant did not include the Bates-numbered version of these documents making their origin and relation to surrounding documents more difficult to determine.

The defendant protests that agents seized a health care identification card and a driver license issued to Boris Motovich contained in pages 9 and 10 of Exhibit F. But these documents are responsive to the iCloud Warrant. As set forth in the iCloud Affidavit and Warrant, Boris Motovich was identified as a subject of the investigation, (see Gov. Hearing Ex. 3-007) and, as will be established at trial, received checks from the shell companies created by the defendant. Thus, these documents are clearly "records relating to the identit[y] of entities and individuals receiving checks from the Shell Companies," (see Ex. 3-008). For the same reasons, the photographs of identification documents belonging to his son and wife, including driver's licenses and passports, and a photograph of the defendant and his wife (see pages 5, 12, and 17 of Exhibit F) are all identification documents of individuals receiving checks (either directly or indirectly through company accounts) from the shell companies. The defendant cannot complain that the government seized personal documents of his family members when he involved them in his criminal conduct.

The defendant also claims that page 13 of Exhibit F is nonresponsive. Again, he is wrong. The communication references the "Excelsior" board. The Excelsior is the name of the defendant's residence; the defendant used funds in the shell companies to make significant improvements to the Excelsior residence. It is responsive. (See Gov. Hearing Ex. 3, Attach. B-3(II)(c), (g), (h)-(i)).

As another example, the defendant wrongly claims that certain videos seized from the iCloud account are nonresponsive. Take, for example, the video titled "IMG_0076." As explained during the April 2 hearing, the photograph shows the defendant with other individuals including his brother-in-law and an individual named Yoel Braun, both of whom received checks from the shell companies. (See Gov. Hearing Ex. 4-044 and 4-045; Gov. Hearing Ex. 3, Attach. B-3(II)(d)-(e)).

As for the video titled "IMG-0631," this video shows co-defendant Marina Kuyan, also identified as a subject of the investigation, (see Gov. Hearing Ex. 4-044, Gov. Hearing Ex. 3-007), on a private jet flight. The defendant used funds in the shell companies to pay companies purportedly providing private jet service, including issuing a check in the amount of $65,000 to a company called "FlyLux." For the same reason, the video beginning with "59993663349" is also responsive.

The video titled "IMG_0649" shows bar mitzvah invitations for one of the defendant's sons. As set forth in the Affidavit for the iCloud, the defendant had used more than $7,000 in shell company funds to pay for invitations for one of his son's bar mitzvah celebrations. It is responsive. (See Gov. Hearing Ex. 3, Attach. B-3(II)(c)-(i)).

The video titled "IMG_3653," shows the defendant's second-floor office at Midwood Lumber, which is where he ran his illegal check cashing operation. It is responsive.

Although the government submits that such granular analysis of the 108 documents is unnecessary for the Court to resolve this motion, the government makes such a

7

proffer to underscore the impropriety of the defendant claiming—without foundation—that documents are unresponsive as a tactic to force an unnecessary and irrelevant hearing.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/                            
Robert Polemeni
Erik Paulsen
Andrew Grubin
Matthew Skurnik
Assistant U.S. Attorneys
(718) 254-7000

Cc: Clerk of the Court (WFK)
    All counsel (by ECF)