# WACHTELL, LIPTON, ROSEN & KATZ

51 WEST 52ND STREET
NEW YORK, N.Y. 10019-6150

TELEPHONE: (212) 403-1000
FACSIMILE: (212) 403-2000

GEORGE A. KATZ (1965-1989)
JAMES H. FOGELSON (1967-1991)
LEONARD M. ROSEN (1965-2014)

MARTIN LIPTON
HERBERT M. WACHTELL
EDWARD D. HERLIHY
DANIEL A. NEFF
STEVEN A. ROSENBLUM
JOHN F. SAVARESE
SCOTT K. CHARLES
JODI J. SCHWARTZ
ADAM O. EMMERICH
RALPH M. LEVENE
RICHARD G. MASON
ROBIN PANOVKA
DAVID A. KATZ
ILENE KNABLE GOTTS
TREVOR S. NORWITZ
ANDREW J. NUSSBAUM
RACHELLE SILVERBERG
STEVEN A. COHEN
DEBORAH L. PAUL
DAVID C. KARP
RICHARD K. KIM
JOSHUA R. CAMMAKER

MARK GORDON
JEANNEMARIE O'BRIEN
WAYNE M. CARLIN
STEPHEN R. DiPRIMA
NICHOLAS G. DEMMO
IGOR KIRMAN
JONATHAN M. MOSES
T. EIKO STANGE
WILLIAM SAVITT
GREGORY E. OSTLING
DAVID B. ANDERS
ADAM J. SHAPIRO
NELSON O. FITTS
JOSHUA M. HOLMES
DAVID E. SHAPIRO
DAMIAN G. DIDDEN
IAN BOCZKO
MATTHEW M. GUEST
DAVID E. KAHAN
DAVID K. LAM
BENJAMIN M. ROTH
JOSHUA A. FELTMAN

OF COUNSEL

ANDREW R. BROWNSTEIN
MICHAEL H. BYOWITZ
KENNETH B. FORREST
BEN M. GERMANA
SELWYN B. GOLDBERG
PETER C. HEIN
JB KELLY
JOSEPH D. LARSON
LAWRENCE S. MAKOW
PHILIP MINDLIN
THEODORE N. MIRVIS
DAVID S. NEILL
HAROLD S. NOVIKOFF

ERIC S. ROBINSON
ERIC M. ROSOF
MICHAEL J. SEGAL
WON S. SHIN
DAVID M. SILK
ROSEMARY SPAZIANI
ELLIOTT V. STEIN
LEO E. STRINE, JR.*
PAUL VIZCARRONDO, JR.
JEFFREY M. WINTNER
AMY R. WOLF
MARC WOLINSKY

* ADMITTED IN DELAWARE

COUNSEL

DAVID M. ADLERSTEIN
SUMITA AHUJA
FRANCO CASTELLI
ANDREW J.H. CHEUNG
PAMELA EHRENKRANZ
ALINE R. FLODR
KATHRYN GETTLES-ATWA
ADAM M. GOGOLAK
ANGELA K. HERRING

MICHAEL W. HOLT
MARK A. KOENIG
CARMEN X.W. LU
J. AUSTIN LYONS
ALICIA C. McCARTHY
JUSTIN R. ORR
NEIL M. SNYDER
JEFFREY A. WATIKER

ELAINE P. GOLIN
EMIL A. KLEINHAUS
KARESSA L. CAIN
RONALD C. CHEN
BRADLEY R. WILSON
GRAHAM W. MELI
GREGORY E. PESSIN
CARRIE M. REILLY
MARK F. VEBLEN
SARAH K. EDDY
VICTOR GOLDFELD
RANDALL W. JACKSON
BRANDON C. PRICE
KEVIN S. SCHWARTZ
MICHAEL S. BENN
ALISON ZIESKE PREISS
TIJANA J. DVORNIC
JENNA E. LEVINE
RYAN A. McLEOD
ANITHA REDDY
JOHN L. ROBINSON
JOHN R. SOBOLEWSKI

STEVEN WINTER
EMILY D. JOHNSON
JACOB A. KLING
RAAJ S. NARAYAN
VIKTOR SAPEZHNIKOV
MICHAEL J. SCHOBEL
ELINA TETELBAUM
ERICA E. AHO
LAUREN M. KOFKE
ZACHARY S. PODOLSKY
RACHEL B. REISBERG
MARK A. STAGLIANO
CYNTHIA FERNANDEZ
   LUMERMANN
CHRISTINA C. MA
NOAH B. YAVITZ
BENJAMIN S. ARFA
NATHANIEL D. CULLERTON
ERIC M. FEINSTEIN
ADAM L. GOODMAN
STEVEN R. GREEN
MENG LU

Direct Dial: (212) 403-1248
E-Mail: RWJackson@wlrk.com

April 9, 2024

The Honorable William F. Kuntz II
United States District Judge
U.S. District Court for the
Eastern District of New York
225 Cadman Plaza East

Re: *U.S. v. Motovich*, et al., 21 Cr. 497 (WFK)

Dear Judge Kuntz:

      We respectfully submit this letter, on behalf of our client David Motovich, in further support of his omnibus pretrial suppression and discovery motions. This letter, which supplements our briefing on these motions, is focused on several discreet issues raised by the Government's statements and decisions at the suppression hearing. As discussed in more detail below, consideration of these issues further underscores that the Government failed to meet its burden and that the Defendant's motion should be granted.

**Discussion**

I. **The Government Failed at the Hearing to Offer Any Substantive Evidence to Support the Factual Representations in its Briefing Upon Which it Relies**

As the defense emphasized at the hearing, the government made multiple factual representations in their briefing opposing the suppression motion, but each of those assertions suffered from a lack of any factual support in the record. For example:

- The Government argued that the Midwood warrant was not "overbroad" because "the Midwood Warrant authorized seizure from Midwood Lumber of records, whether physical or electronic, that post-dated January 2012 and related to the Subject Offenses involving identified defendants and co-conspirators." (Br. 43**). But an executing agent would have had no way of knowing, since the search warrant affidavits were not incorporated or attached to the warrants, how or whether any particular item "related to the Subject Offenses." (Motovich Suppression Motion, Dkt# 184, Exhibits B and E). The warrant and its attachments contained no information regarding the subject offenses. Id. Indeed, because the Government, in contravention with DOJ practice for decades, refused to call even a single witness at the hearing, there is no evidence in the record upon which the court can rely even to find that the executing agents received the attachments to the warrant, or even the warrant itself, before executing the search.** There was also no testimony as to how the agents interpreted whatever information was in their possession. The Government offered no testimony or evidence on what was seized and what was left behind. The Government cannot argue on this record that the warrant was not overbroad, that the searches did not result in overseizure, or that any overseizure should be excused based on the good faith of the agents.

- With no citation to any document or testimony, the Government in its briefing argued that  Put simply, Motovich engineered a fraud that permeated Midwood Lumber's overall business. The business was used to support Shell Companies; company paperwork and email were used to further the fraud; company employees drove the criminal activity forward; and the second floor was used to store illicit proceeds and conduct illegal business. Finally, the business was itself a customer of the fraud, using Motovich's illicit cash to pay its workers under the table and commit payroll tax evasion." (Br. 43). **The Government offered no testimony or other evidence at the hearing to support these assertions.**

- In arguing that the images, videos and 396 pages of improperly seized materials from Mr. Motovich's icloud should not be considered overseizure, the Government argued that "The defense attachments are but a small sample of the overwhelming evidence taken from the search locations, including Motovich's instructions regarding conducting

transactions in the Shell Company bank accounts, screenshots of online banking related to the fraudulent accounts, copies of fraudulent insurance certificates and communications with co-conspirators, to name just a few." (Br. 51). **Putting aside that the defense supplemented the attachments to its motion with additional documents supporting overseizure, the Government has offered no evidence whatsoever on which the Court could base a finding that the defense attachments are "small sample."** The Government has provided no testimony or evidence whatsoever explaining what items were seized during the search and what portion of the search is comprised of the improperly seized items.

- The Government argued "in relation to Midwood Lumber, it is of particular relevance that some materials could not reasonably be searched on site." (Br. 51). **Again, the Government offered no testimony or evidence of *what* items were even seized on site, as opposed to obtained from one of the many third parties the Government has subpoenaed and obtained voluntary evidence from.** The Government certainly has not offered any testimony supporting the not that certain materials "could not be reasonably searched on site"—the Court could not make such a finding without testimony in the record supporting such a conclusion. There is no evidence to support this assertion whatsoever.

- The Government argued "The defendant, who intertwined his overall business with the criminal scheme, made it extremely difficult to separate any 'legitimate' business records from illegitimate records." (Br. 51). Yet again, there is no evidence in the record supporting this assertion—this is merely a naked accusation from whichever AUSA drafted this sentence in the brief. **The Government failed to offer any testimony explaining a basis for a conclusion that the defendant intertwined his "legitimate" business with the activities that are the subject of the indictment, and more importantly failed to offer any testimony that this was one of the considerations of the executing agents during the search.** There was no testimony about what, exactly, happened at the search that made separating these items difficult, and there is thus no basis in the record for the Court to find that this was part of the good faith analysis of any executing agent.

- The Government argued "The agents attempted a less intrusive approach by seeking the password for the system so that they might image the computers on-site. However, after waiting a reasonable period for the password, they proceeded to seize the servers." (Br. 51). **There is zero testimony in the record about this supposed set of events.** There is no evidence that has been presented supporting it. The Government failed to call any agent that could explain to whom the Government spoke, how long the agents supposedly waited, or any of the other questions raised by the bald assertion herein referenced.

- The Government argued "Further complicating the search of the defendant's purportedly otherwise legitimate business, employees at Midwood Lumber appeared to have been

told to remain home from work, resulting in searching agents having to make on-scene determinations about seizing categories of items without the benefit of any officer manager or employee's directions." **In this statement, the Government not only openly speculated about what employees at Midwood might have been told by an unidentified party, the Government offered no testimony to explain what the agents' basis might have been for the speculation, and the Government failed to offer any testimony that the agents engaged in this type of analysis, or that the agents failed to receive any assistance from employees on sight.** The Government's attempt to rely on this statement with no factual support is a spectacular abandonment of fundamental constitutional principles.

- The Government argued that "a significant number of the documents that Motovich cites in support of his overseizure argument are in fact relevant to the government's investigation. These documents are connected to entities or individuals referenced in the Indictment." (Br. 52-53). In making this assertion, the prosecutors grossly misunderstood their obligations under the 4th Amendment. **Even if the Court were entitled to find, on the basis of the prosecutor's unsupported assertion, that these items were relevant to the investigation (such a finding would be improper, for reasons discussed later in this submission), the relevant inquiry for good faith as it relates to overseizure is not whether the prosecutors can come up with some after-the-fact justification for the seizure of any particularly item, but rather whether items seized that could not have determined as justified, purely on the basis of the warrant and its actual enclosures, were seized based on the *agents'* good faith calculation of how the seizure of these items related to the information they possessed at the time of the search.** As is obvious, the Government failed to offer any such evidence, and indeed moved to prevent the defense from even calling the agents to inquire about any of these topics. The Government utterly failed to meet its burden."

- The Government argued that "the searching agents' actions in this case were diligent and reasonable and not sufficiently culpable or susceptible of deterrence to warrant application of the exclusionary rule. In both cases, the agents reasonably relied on warrants that, on their faces, clearly complied with binding Fourth Amendment precedent." (Br. 55). **The Government failed to offer any testimony whatsoever explaining what the agents did at the search, upon which the Court could determine the agents' execution of the search was diligent and reasonable.** There was no testimony of what the agents relied upon, much less testimony sufficient to support a finding that such reliance was "reasonable."

## II. The Court Cannot Rely on the Prosecutors' Unsworn Assertions at the Hearing

Importantly, the Government conceded at the hearing that the agents conducting the search in engaged in improper overseizure. (Tr. 54 (So the defense claims that of the 0.4 percent, about 300 pages, not items, but pages, are not within the scope of the warrant. **And**

**some actually are, Your Honor.** And again, we could go through, like, what is and what isn't. But as in any large electronic seizure, **yes, some are not -- to answer the defense attorney's question, some are not responsive**."). The Government's concededly bad math (Tr. 54 ("math is not my strong suit, that's why I went to law school, Your Honor")) was actually much worse than advertised, because: (1) the Government failed to introduce or point to any reliable evidence supporting the .4 percent calculation it cited, much less its claims regarding the size of the seizure population; (2) the defense never claimed that the 300 pages of examples of overseizures represented the entirety of the overseizure population—it was not the defense burden to demonstrate and go through at the hearing each and every example of overseizure—if the government wanted to make this statistical point, it was the Government's burden to offer testimony explaining what the size of the seizure population was, how it was calculated, and how it determined what portion of it was improperly seized; and (3) given that there is no reliable information in the record as to these figures and the Government conceded overseizure, amounting to, at a minimum, hundreds of items, the Government had the burden to submit proof, testimony, explaining how it happened how it could be disregarded as an artifact of the agents good faith. The defense was entitled to cross-examine such evidence at the hearing, but none was produced, only the unsworn testimony of the prosecutors. The Government offered the Court nothing.

Indeed the Government's assertion that it "doesn't intend to even use those 300 pages at trial" (Br. 54) is meaningless in the context, because there is not even information in the record to contextualize the sample and the issue of overseizure, as explained in our prior briefing, goes far beyond the 300 documents. The suggestion that the defense can simply object at trial whenever a document is offered that the defense believes is a product of overseizure, borders on the absurd. Such a process would require the Court to hold a mini suppression hearing, eliciting testimony from the agents on their good faith, at sidebar repeatedly throughout the trial. It would also place on the defense the unreasonable burden of analyzing the provenance of every document introduced as it is introduced at trial. The purpose of a suppression hearing—indeed the reason it almost always is scheduled substantially in advance of trial—is that these are not issues that can practically be resolved repeatedly in the middle of trial testimony.

For this precise reason, because a determination of good faith in the suppression context requires a detailed testimonial inquiry in advance of trial, Judge Nathan in *Wey*, upon which the Government relies (Br. 17 et seq.), required the testimony of agents (which the Court ultimately found insufficient) at the suppression hearing in that case. *See Wey*, 256 F. Supp. 3d 355, (S.D.N.Y. 2017) ("the Court made a preliminary determination that a hearing was warranted to address whether the Government acted in good faith in executing the NYGG Warrant and the Apartment Warrant and whether the Government acted reasonably and in good faith in executing off-site searches of computers and computer-related equipment recovered during the execution of the Warrants. Dkt. No. 69. Accordingly, the Court conducted a two-day suppression hearing on January 23 and January 24, 2017 (the "Hearing"), at which it heard live testimony from former Assistant United States Attorney David Massey, Special Agent Komar, Special Agent Thomas McGuire, Special Agent Elizabeth Miller, forensic examiner and information

technology specialist Brian Boot."). All of the court's factual findings in that case involved a detailed analysis of the testimony offered by the government at that hearing—which included the testimony of an AUSA as well as the testimony of three Special Agents and a forensic technology specialist. *Id.* In contrast, here the Government offered the Court nothing of the sort.

Instead, as described above, the Government repeatedly returned to the unsworn assertions of the AUSAs from the podium. Those unsupported assertions were even more problematic where the Government seemed to fail to recognize that the prosecutors' views as to what was responsive, based on their participation in the case, were irrelevant. The core question, among others, was whether the agents could be said to have acted in good faith in seizing items beyond the scope of what could be properly seized on the basis of the warrant. The Government elicited no testimony on this subject, but rather repeatedly returned to the prosecutors' analysis of what items made sense based on the search warrant affidavits (**which were not incorporated into to the warrant**) and unknown additional information the prosecutors appeared to rely on from their involvement in the investigation:

During the suppression hearing, the government attempted to rationalize its overbroad seizures on the basis that some of the examples in defendant's Exhibit A were "responsive." In doing so, the government provided explanations that have no basis in the warrants, nor in the unincorporated[1] affidavits in support of the warrant applications. For example:

- The government stated that Tab 4 of Defense Hearing Exhibit A,[2] and others reflected emails to the account associated with him, explaining that Eddy is an employee at Midwood Lumber and alleging that Eddy "helps Mr. Motovich with his cash checking business." (Tr. 74:7-12). **This allegation has no basis in the warrants or their attachments, which is the only relevant document for this analysis. Even if the affidavits could be considered in examining whether the agents' overseizure was done in good faith (and they cannot), and the government offered no testimony or other evidence that could explain why the executing agents seized emails of employees not named as co-conspirators and not falling within the scope of the**

---

[1] *See Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004) ("The fact that the *application* adequately described the "things to be seized" does not save the *warrant* from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents. And for good reason: "The presence of a search warrant serves a high function," *McDonald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 93 L.Ed. 153 (1948), and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection."

[2] As explained elsewhere, Exhibit A reflects only a subset of examples of the government's overbroad seizures. There are, at a minimum, thousands of other such documents, including religious materials, health insurance records, and other business records of Midwood Lumber unrelated to the government's allegations regarding a check-cashing scheme.

- **warrant**. *See* Midwood Lumber Warrant, Attach. B-1 at 1(g) (authorizing seizure of certain "[r]ecords relating to communications with co-conspirators").

- The government stated that certain other tabs reflected emails to Ezra Weingarten, another employee at Midwood Lumber, who it alleged "receives a significant amount of money from the check cashing scheme." (Tr. 74:24-75:4). **Again, this allegation has no basis in the warrants or their attachments. Even if the affidavits could be considered in examining whether the agents' overseizure was done in good faith (they cannot), the government has provided no explanation for why it seized emails of employees not named as co-conspirators and not falling within the scope of the warrant.** *See* Midwood Lumber Warrant, Attach. B-1 at 1(g) (authorizing seizure of "[r]ecords relating to communications with co-conspirators").

- The government asserted that Tab 20, financials for Midwood Lumber prepared in 2016, was responsive because "there's mentions of cash on it." (Tr. 76:3-5). **This assertion was also disconnected from any testimony or evidence regarding what information the agents possessed at the time of the searches justifying such a seizure. Moreover, the government's statement is a virtual concession that the agents executed a functional general warrant**—if any reference or connection whatsoever to "cash" would have rendered an item seizable within the scot of the warrant, that would have eliminated any possible limitation by paragraph 1 of Attachment B-1 to the Midwood Lumber Warrant.

- The government argued that Tab 21, health care records for Neomy Dialysis Center, is responsive because "Mr. Motovich sends [money] to that company as part of his check-cashing scheme." (Tr. 76:6-12). **But Neomy is not mentioned in the warrants or their attachments—even assuming the agents had the attachments (there was no evidence of this at the hearing) there could have been no good faith basis for the executing agents to seize such an item, nor is it alleged to be a shell company.** Neomy is not even mentioned in the warrant affidavits, which are irrelevant to the key analysis because they were not incorporated into the warrants. There is no evidence or even a reasonable inference available that the agents ever saw the affidavits.

- The government argued that a photo showing Mr. Motovich's brother-in-law, Dr. Ryan Deutch, at a birthday party is responsive because Dr. Deutch allegedly "receives significant benefits from the check cashing and fraud schemes." (Tr. 79:9-18). **Dr. Deutch is not mentioned in the warrants or their attachments—even assuming the agents had the attachments (there was no evidence of this at the hearing) there could have been no good faith basis for the executing agents to seize such an item.** Dr. Deutch is not even mentioned in the warrant affidavits, which were not even incorporated into the warrants. *Groh*, 540 U.S at 557 ("The fact that the application adequately described the 'things to be seized' does not save the warrant from its facial invalidity . . . . We do not say that the Fourth Amendment prohibits a warrant from cross-referencing

other documents. Indeed, most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant. But in this case the warrant did not incorporate other documents by reference, nor did either the affidavit or the application (which had been placed under seal) accompany the warrant. Hence, we need not further explore the matter of incorporation.") (internal citation omitted).

None of this was appropriate evidence at a suppression hearing; none of these assertions, even if considered, had any relationship to the actual issues for the hearing; and none of these assertions can be appropriately relied upon by the Court. Indeed, the expansiveness of the Government's assertions about what was responsive only underscores the overall impropriety of the search. *See, e.g., Wey*, 256 F. Supp. 3d at 393-94 ("[T]he sheer scope of the Warrants—reaching . . . essentially all documents . . . unlimited by relevance to criminal conduct or by timeframe—precludes a finding that the seizure authorization remained within the bounds of the Government's probable cause showing.").

The government's attempt to justify these examples of overbroad seizure as falling with the scope of the warrants also undermines its contention that the warrants satisfied the particularity requirement. Indeed, in both its opposition and during the hearing, the government tried to rationalize the overbroad seizures by invoking the so-called "all-records exception" to the particularity requirement. *See* Opp. at 43 (arguing fraud "*permeated* Midwood Lumber's overall business" (emphasis added)); Tr. 44:23-25. Under this exception, all records of a business may be seized if there is probable cause to believe the operation is "permeated with fraud." *United States* v. *Zemlyansky*, 945 F. Supp. 2d 438, 460 (S.D.N.Y. 2013). The showing necessary to invoke this exception, however, is substantial: The government must provide the magistrate judge with "sufficient probable cause to believe that the *entire* business operation is a scam." *Id.* at 461. The affidavit in support of the Midwood Lumber Warrant doesn't come close to meeting this heightened standard. There is no question that Midwood Lumber operates a real business as a "commercial hardware store." Aff. In Support of Midwood Lumber Warrant ¶ 5.

In sum, the government's efforts during the suppression hearing to justify the overbroad seizures only further highlight the constitutional deficiencies with the warrants and their execution.

### III. The Government Utterly Failed to Meet its Burden of Demonstrating Agents' Good Faith

As the Government concedes, it bears the burden of proof at a suppression hearing. *See United States* v. *Wyche*, 307 F Supp.2d 453, 457 (E.D.N.Y.2004) ("On a motion to suppress evidence in a criminal trial, once [the defendant] establishes a basis for his motion, the burden rests upon the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers."). Yet, as described above, given extensive opportunity by Your

Honor, the Government simply refused to call or produce any witnesses to support its reliance on the doctrine of "good faith." Instead, the Government sought to sidestep the issue by arguing that the inquiry is largely an "objective" one. (Tr. 48:7). That an inquiry is objective does not negate the need for testimony upon which to based the objective determination. Such a framework does not absolve the government of its "burden . . . to demonstrate the objective reasonableness of the officers' good faith." *United States* v. *Bershchansky*, 788 F.3d 102, 113 (2d Cir. 2015). As numerous courts within this Circuit have explained, this is necessarily a factual inquiry. *See, e.g., United States* v. *Pinto-Thomaz*, 352 F. Supp. 3d 287, 309 (S.D.N.Y. 2018) ("The Court is unable to make this determination [of whether agents acted in good faith] absent evidence concerning how law enforcement agents executed [the] search warrant."); *United States* v. *Zemlyansky*, 945 F.Supp.2d 438, 474 (S.D.N.Y. 2013) (rejecting the government's "good faith" defense, partly because of the government's limited presentation of how agents conducted the search).

Again, *United States* v. *Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017), is illustrative. There, the court held a two-day suppression hearing to determine whether the government acted in good faith in executing the warrants and in executing off-site searches of computers recovered during the execution of the warrants:

> "[T]he Court conducted a two-day suppression hearing on January 23 and January 24, 2017 (the 'Hearing'), at which it heard ***live testimony*** from former Assistant United States Attorney David Massey, Special Agent Komar, Special Agent Thomas McGuire, Special Agent Elizabeth Miller, forensic examiner and information technology specialist Brian Booth.
>
> "What follows for the remainder of this Opinion constitutes the Court's findings of fact and conclusions of law. ***They are based upon the evidence taken at the hearing—with the benefit of supplemental post-hearing briefing and oral argument—as well additional evidentiary submissions by the parties in support of their original and supplemental briefs.***"

*Id.* at 366-67 (emphasis added). The *Wey* case and others underscore how far the government's approach in this case is outside the normal boundaries of what would be expected for it to meet its burden.

The case cited by the government during the hearing in support of its good faith argument, *United States* v. *Burke*, 718 F. Supp. 1130 (S.D.N.Y. 1989), does not indicate otherwise. There, in considering whether the "good faith" exception applied, the court engaged in a factual inquiry, referencing affidavits provided by government agents regarding the applications for and execution of the warrants at issue:

WACHTELL, LIPTON, ROSEN & KATZ

> "Searches pursuant to all three warrants were executed simultaneously on April 22, 1985. Before the searches, the postal inspectors who were to conduct them met, and each was provided with a copy of the warrant and affidavit; the scope of the search was fully discussed. (DeMuro Aff. at ¶ 9) Moreover, the three officers who swore out the supporting affidavits for the search warrants—DeMuro, Morahan, and Paschel—participated in the searches of, respectively, the Manhattan, Southampton and Stamford locations. (Pinorsky Aff. at ¶ 2 & Exh. A). . . .
>
> "I find that the circumstances of the searches here show powerful indicia of good faith . . . . [A]lthough the affidavits, which limited the scope of the search to Dali artwork and documents related to Dali sales, were not attached to the warrants, and might not simply because of such attachment cure a particularity problem, ***the circumstances of the search reveal that, as a practical matter, these affidavits did limit the scope of the warrants. Each of the searching agents each was given a copy of the relevant affidavit, and the affiants participated in the searches.*** Moreover, notable by its absence, given the extensive briefing of this motion, is any claim in defendants' papers that the government agents in fact carted away the entire office or took non-Dali artwork. In other words, no general search was conducted. To the contrary, government agents followed the limitations to the search warrants set forth in the affidavits."

*Id.* at 1134, 1141-42.

By contrast, the government has provided no such information here. To date, the government has put forward no proof regarding the conduct of the searches. There is nothing in the factual record detailing how or why the agents' seized so much personal and irrelevant material during the contested searches. The Government has therefore failed to meet its burden of demonstrating the searching agents' good faith.

### IV. The Government's Remaining Caselaw in Inapposite

In addition to citing *Burke*, during the suppression hearing, the government pointed to *United States* v. *Frey*, 2022 WL 1284318 (E.D.N.Y. 2022), as providing a "roadmap" on particularity and overbreadth. That case is inapposite, as the warrants at issue related to sex trafficking and kidnapping. *Id.* at *1-2. Because of the nature of the crimes at issue, the set of records encompassed by those warrants were inherently more particularized than the Midwood Lumber and iCloud Warrants. Moreover, the warrants in *Frey* sought records from a significantly more limited time period—about three years compared to the ten years of records sought here.

The government also cited to *United States* v. *Nejad*, 436 F. Supp. 3d 707, 736 (S.D.N.Y. 2020), arguing it addressed a similar responsiveness rate from a review of electronically stored media to determine what documents fell within the scope of the search warrants. Tr. at 53:4-12. There—unlike here—the government provided information regarding its responsiveness review, including search terms and methodology:

> "The Government asserts that the review was conducted by D.A. employees who in many instances were quite familiar with the investigation; these reviewers met and discussed the review of the search warrant returns, including the use of certain search terms, on several occasions; and documents tagged as responsive were typically segregated into responsiveness folders organized by subject matter. See Dkt. No. 155 at 19–21. Though it may have been more desirable for the reviewers to have agreed upon a comprehensive set of search terms and consistently removed documents tagged as responsive from the review population over the course of the review, the review methodology was nonetheless reasonable under the circumstances."

436 F. Supp. 3d at 734. Moreover, based on this information provided by the government, the court suppressed certain documents which were marked responsive following the conclusion of the responsiveness review and therefore exceeded the scope of the warrants' authority. *Id.* at 736. Here, the government has provided no information to allow the Court to make a determination of whether the searches of the electronically stored media were reasonable.

## Conclusion

For all of the reasons described in his moving papers and herein, the Court should grant defendant David Motovich's motions.

Respectfully submitted,

Randall W. Jackson

Cc: All noticed counsel, by ECF