UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,         :
                                  :
         v.                :     **MEMORANDUM & ORDER**
                                  :     21-CR-497 (WFK)
DAVID MOTOVICH            :
and JOSHUA MARKOVICS,     :
                                  :
              Defendants.    :
-----------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Before the Court are Defendant David Motovich's and Joshua Markovics's ("Defendants") motions to dismiss six counts of the Indictment; suppress materials from Defendant Motovich's iCloud account and business; direct the Government to file a bill of particulars; and direct the Government to disclose *Brady* materials. For the reasons set forth below, Defendants' motions are DENIED.

## I.    BACKGROUND

On August 20, 2021, the Government filed a Complaint charging Defendant Motovich with bank fraud, aggravated identify theft, and witness tampering. Compl., ECF No. 1.

On September 22, 2021, a grand jury returned an 18-count Indictment against Defendant Motovich, Defendant Markovics, and two other defendants. Indictment, ECF No. 19. The Indictment charges these Defendants with operating an unlicensed money transmitting business (Count 1); failure to file currency transaction reports ("CTRs") (Count 2); bank fraud (Counts 3 through 6); conspiracy to commit bank fraud (Count 7); money laundering (Counts 8 through 14); conspiracy to commit money laundering (Count 15); aggravated identity theft (Count 16); conspiracy to defraud the United States (Count 17); and witness tampering (Count 18). *Id.* The Indictment also contains criminal forfeiture allegations as to all counts. *Id.* ¶¶ 45-52. Defendant Motovich is charged in all Counts. Defendant Markovics is charged in Counts 3, 7, and 16. The charged conduct pertains to various activities associated with Defendant Motovich's alleged illegal check-cashing business.

On December 26, 2023, Defendant Motovich moved to dismiss Counts 3, 4, 5, 6, 7, and 16 of the Indictment.  Motovich Notice of Motion to Dismiss, ECF No. 181; Motovich Motion to Dismiss Memorandum ("Mot. to Dismiss"), ECF No. 182.  Defendant Markovics joined this motion.  Markovics Motion to Dismiss, ECF No. 175.  Also on December 26, 2023, Defendant Motovich, joined by Defendant Markovics, moved to:  (1) suppress materials seized from Defendant Motovich's iCloud account, or, in the alternative, hold a suppression hearing; (2) suppress materials seized from Midwood Lumber, or, in the alternative, hold a suppression hearing; (3) direct the Government to file a bill of particulars; and (4) direct the Government to immediately disclose *Brady* materials, specifically an IRS Special Agent Report ("SAR") and materials pertaining to John Doe #1.  Motovich Notice of Omnibus Motion, ECF No. 183; Motovich Omnibus Memorandum of Law ("Omni. Mot."), ECF No. 184; Markovics Omnibus Motion, ECF No. 175.  On February 16, 2024, Defendant Markovics filed a Counterstatement of Facts in Further Support of his Motion to Dismiss.  Markovics Counterstatement of Facts, ECF No. 204.

The Court heard oral argument on Defendants' motion to dismiss on March 21, 2024, at the close of which the Court granted counsel leave to file supplemental briefing.  The Government filed a supplemental opposition brief on March 28, 2024.  ECF No. 217.  On April 2, 2024, the Court held a suppression hearing on Defendants' motions to suppress, after which, with leave of the Court, both the Government and Defendant Motovich filed supplemental briefing.  Gov't Supplemental Suppression Briefing ("Gov't Suppl. Suppr. Br."), ECF No. 222; Defendant Motovich Supplemental Suppression Briefing ("Motovich Suppl. Suppr. Br."), ECF No. 223.  On May 10, 2024, the Government filed a letter informing the Court of post-briefing caselaw developments.  ECF No. 235.

## II.   MOTION TO DISMISS COUNTS THREE, FOUR, FIVE, SIX, AND SEVEN (COLLECTIVELY, "BANK FRAUD COUNTS"), AND COUNT SIXTEEN ("AGGRAVATED IDENTITY THEFT COUNT")

### A.   Legal Standard

"A motion to dismiss an indictment must satisfy a high standard." *United States v. Mavashev*, 8-CR-902, 2009 WL 4746301, at *5 (E.D.N.Y. Dec. 7, 2009) (Irizarry, J.) (quoting *U.S. v. Brooks*, 2009 WL 3644122, at *2 (E.D.N.Y. Oct. 27, 2009)); *see* Fed. R. Crim. P. 12(b)(3)(B). That is because "[a]n indictment . . . need not be perfect, and common sense and reason are more important than technicalities." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001). Indeed, "[d]ismissal of an indictment is an 'extraordinary remedy,' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Sammy*, 763 Fed. App'x 45, 46 (2d Cir. 2019) (summary order) (quoting *De La Pava*, 268 F.3d at 165). When reviewing a pretrial motion to dismiss, the Court "must accept the Government's factual allegations as true." *United States v. Carnesi*, 461 F. Supp. 2d 97, 98 (E.D.N.Y. 2006) (Spatt, J.).

"The Supreme Court has held that an indictment is sufficient if it (1) 'contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend' and (2) 'enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Benjamin*, 95 F.4th 60, 66 (2d Cir. 2024) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). "Typically, to state an offense, an indictment 'need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state time and place in approximate terms.'" *United States v. Frias*, 521 F.3d 229, 235 (2d Cir. 2008) (quoting *United States v. Flaharty*, 295 F.3d 183, 198 (2d Cir. 2002)); *see also United States v. Zullo*, 581 F. App'x 70, 71 (2d Cir. 2014)

3

(summary order) ("An indictment charges a federal offense if it alleges all of the statutory elements essential for conviction."). In other words, "the indictment need only allege the core of criminality the Government intends to prove at trial, since the indictment is read . . . to include facts which are necessarily implied by the specific allegations made." *United States v. Murgio*, 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016) (Nathan, J.).

### B.   Legal Sufficiency of the Bank Fraud Counts

The Court declines to dismiss the Bank Fraud Counts for failing to state offenses. 18 U.S.C. § 1344 prohibits individuals from "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." As summarized in *United States v. Weigand*:

> To state a violation of Subsection 1 of the bank fraud statute, the Government must allege that a defendant (1) knowingly executed (or attempted to execute) a scheme to "deceive [a] bank," (2) through "a misrepresentation or concealment of material fact," and (3) to "deprive it of something of value," with (4) "knowledge that [the defendant] would likely harm the bank's property interest" through the scheme.

> To state a violation of Subsection 2, the Government must allege that a defendant (1) knowingly executed (or attempted to execute) a scheme through which the defendant "intend[ed] to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution" (hereinafter, "bank property"); (2) the defendant made "false or fraudulent pretenses, representations, or promises" (hereinafter, "misrepresentations"); (3) the misrepresentations were "of material fact"; and (4) the misrepresentations were the "means" by which defendant intended to obtain the bank property.

482 F. Supp. 3d 224, 234-35 (S.D.N.Y. 2020) (Rakoff, J.) (footnotes with citations omitted) (alterations in original). 18 U.S.C. § 1349 criminalizes conspiracy to commit bank fraud.

4

The Indictment alleges, *inter alia*: (1) Defendant Motovich "deposited the checks made payable to the Shell Companies into bank accounts maintained in the names of the Shell Companies . . . that [Defendant] Motovich . . . opened at several financial institutions," Indictment ¶ 15; (2) "[w]hen opening the Shell Company Bank Accounts and while each account was open, [Defendant] Motovich . . . made numerous materially false representations to each of the Banks, including falsely representing the identity of the accounts' beneficial owner, the nature of the Shell Companies' businesses and the business rationales for certain transactions," *id.* ¶ 16; (3) "from 2012 to 2018, [Defendant] Motovich deposited more than $55 million into the Shell Company Bank Accounts" and used those funds for a number of personal expenditures, *id.* ¶ 17; (4) "[Defendant] Motovich, together with others, opened the Shell Company Bank Accounts in the names of other individuals" "[t]o conceal [Defendant] Motovich's control of the Shell Companies and Shell Company Bank Accounts and to avoid detection of the illegal check-cashing scheme," *id.* ¶ 20; (5) "on or about August 16, 2016. [Defendants] opened a Shell Company Bank Account . . . for a Shell Company . . . in the name of John Doe 1 at Bank 1 without John Doe 1's knowledge or consent.  To ensure that transactions in the Shell Company 1 Bank Account were effectuated at his direction, even though he was not the authorized signatory on the account, [Defendant] Motovich provided payments in the form of cash and gifts to John Doe 4," *id.* ¶ 21; and (6) Defendants "used the Shell Company 1 Bank Account, among other things, to deposit checks received from customers of the Motovich Check-Cashing Business," *id.* ¶ 22.

The Substantive Bank Fraud Counts themselves state:

> In or about and between January 2012 and November 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, [Defendants] . . . did knowingly and intentionally execute schemes to defraud the financial institutions .

> . . and to obtain moneys, funds, credits, and other property owned
> by, and under the custody and control of, such financial institutions
> by means of materially false and fraudulent pretenses,
> representations and promises.

*Id.* ¶ 31; *see also id.* ¶ 30 (incorporating factual background allegations in paragraphs one

through 25).

As to the Bank Fraud Conspiracy Count, the Indictment alleges:

> In or about and between January 2012 and February 2019, both dates
> being approximate and inclusive, within the Eastern District of New
> York and elsewhere, [Defendants] . . . did knowingly and
> intentionally conspire to execute a scheme to defraud financial
> institutions, and to obtain moneys, funds, credits and other property
> owned by, and under the custody and control of, such financial
> institutions by means of materially false and fraudulent pretenses,
> representations and promises.

*Id.* ¶ 33; *see also id.* ¶ 32 (incorporating factual background allegations in paragraphs one

through 25).

The Bank Fraud Counts "plainly track[] the language of the [applicable underlying]

statute and state[] the time and place of the alleged" bank fraud offenses and incorporate the

Indictment's further factual allegations of Defendants' alleged scheme, thereby properly stating

offenses under Federal Rule of Criminal Procedure 7(c).  *See Frias*, 521 F.3d at 235-236; *see*

*also United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 305 (S.D.N.Y. 2023) (Kaplan, J.)

("Count Nine tracks the statutory language of Section 1344(2) and sufficiently alleges that the

defendant conspired to obtain 'money or property' in violation of the statute."); *United States v.*

*Aronov*, 19-CR-408, 2021 WL 2351175, at *4 (E.D.N.Y. June 9, 2021) (Brodie, C.J.) (denying

motion to dismiss bank and wire fraud charges "because the Indictment tracks the statutory

language of the charged crimes and provides sufficient notice of Herskowitz's alleged criminal

conduct").

Defendants' arguments regarding the purported insufficiency of the Bank Fraud Counts are meritless.  First, Defendants contend, in so many words, that the bank account funds were not the banks' property.  *See, e.g.*, Mot. to Dismiss at 5 ("The Indictment *does not* (because it cannot) allege—or even suggest—that obtaining or risking bank funds was the object of any of the alleged misrepresentations."); Motovich Reply in Support of Motion to Dismiss ("Mot. to Dismiss Reply") at 6, ECF No. 201 ("Bank fraud cannot be predicated on allegations that [Defendant] Motovich stole from his own bank accounts.").  Defendants are wrong.  In *Shaw v. United States*, 580 U.S. 63, 66 (2016), the Supreme Court held banks have property rights in the funds in their customers' accounts. [1]  *Id.* ("Shaw makes several related arguments in favor of his basic claim, namely, that the statute does not cover schemes to deprive a bank of customer deposits. . . . The basic flaw in this argument lies in the fact that *the bank, too, had property rights in Hsu's bank account*.") (emphasis added).  As such, "for purposes of the bank fraud statute, a scheme fraudulently to obtain funds from a bank depositor's account normally *is also a scheme fraudulently to obtain property from a 'financial institution,'* at least where, as here, the *defendant knew that the bank held the deposits*, the funds obtained *came from the deposit account*, and the defendant *misled the bank in order to obtain those funds*." *Id.* at 67 (emphases added).  That is precisely what the Indictment alleges here.  *See, e.g.*, Indictment ¶ 16 ("When opening the Shell Company Bank Accounts and while each such account was open, [Defendant]

---

[1] While *Shaw* was specifically interpreting § 1344(1), the Supreme Court noted the conduct at issue in that case also fell within § 1344(2).  580 U.S. at 71 ("This language [of subsection (2)] covers much that subsection (1) also covers, for example, making a false representation to a bank in order to obtain property belonging to that bank."); *see also id.* ("Given, on the one hand, the overlap and, on the other hand, a plausible reading of the language that applies to circumstances significantly different from those at issue here, we have no good reason to read subsection (2) as excluding from subsection (1) applications that would otherwise fall within the scope of subsection (1), *such as the conduct of the kind before us*.") (emphasis added).

Motovich . . . made numerous materially false representations to each of the Banks, including falsely representing the identity of the accounts' beneficial owner, the nature of the shell companies' businesses and the business rationales for certain transactions."); *id.* ¶ 17 ("From 2012 to 2018, [Defendant] Motovich deposited more than $55 million into the Shell Company Bank Accounts," and explaining how Defendant Motovich used some of those funds); *see also id.* ¶¶ 20-21; 30-33. As such, the Indictment sufficiently alleges bank property was the object of Defendants' misrepresentations to the banks. *See, e.g.*, *Bankman-Fried*, 680 F. Supp. 3d at 305 (finding the indictment properly stated a bank fraud conspiracy claim in "alleg[ing] that the defendant conspired to induce a bank to open an account, which was used to receive FTX customer deposits and from which the defendant and his co-conspirators 'regularly took money' from the bank's custody") (footnote with citation omitted); *United States v. An*, 22-CR-460, ECF No. 171, at *28 (E.D.N.Y. May 7, 2024) (Matsumoto, J.) ("Moreover, even if it were established at trial that all the relevant funds and accounts belonged to the Ans, that would not necessarily require dismissal because the victim banks generally would have had ownership or at least possessory interest in deposited funds and presumably would have profited from the accounts.").

The Court also rejects Defendants' arguments that the Indictment fails to allege bank fraud offenses because "[e]conomic harm to a bank was neither the alleged plan nor a likely outcome of the charged misrepresentations." Mot. to Dismiss at 9. The Supreme Court squarely held § 1344(1) "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Shaw*, 580 U.S. at 67; *see also id.* at 67-68 (noting the bank fraud statute is "analogous" to the mail fraud statute, which the Supreme Court has interpreted as only requiring a showing "that the victim (here, the bank) be 'deprived of its right' to use of the property, even if it ultimately did not suffer unreimbursed loss") (citing *Carpenter v. United States*, 484 U.S. 19,

8

26–27 (1987)). Nor does § 1344(2) require "the Government to prove that the defendant's scheme created a risk of financial loss to the bank." *Loughrin v. United States,* 573 U.S. 351, 366 n.9 (2014). As such, the Indictment need not allege Defendants' bank fraud or bank fraud conspiracy resulted in, or was intended to, risk actual economic or pecuniary loss to the banks.

The Court declines Defendants' invitation to follow *United States v. Nkansah*, 699 F.3d 743 (2d Cir. 2012), *abrogated on other grounds by United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016). While Defendants are technically correct that neither the Second Circuit nor the Supreme Court has explicitly overruled *Nkansah*'s holding that the bank fraud statute requires a risk of economic loss to the bank, *see United States v. Calderon*, 944 F.3d 72, 92 (2d Cir. 2019), like Judge Rakoff, the Court will not ignore subsequent contrary and on point Supreme Court caselaw. *See Weigand*, 482 F. Supp. 3d at 236 ("Though apparently an open question, this is not a difficult one. Four years after the Second Circuit's decision in *Nkansah*, the Supreme Court, as already noted, explicitly held that Subsection 1 requires no 'intent to cause financial loss,' *Shaw*, 137 S. Ct. at 467, and that Subsection 2 requires no 'risk of financial loss to the bank,' *Loughrin*, 573 U.S. at 366 n.9, 134 S.Ct. 2384. Thus, *Nkansah* is no longer good law.").

Further, contrary to Defendants' arguments, the Indictment sufficiently alleges Defendants' misrepresentations were the means by which Defendants sought to obtain bank property, *i.e.* funds in the alleged shell company bank accounts. The "by means of" requirement of § 1344(2) "is satisfied when . . . the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control." *Loughrin*, 573 U.S. at 363. The *Loughrin* Court explained the "by means of" analysis turns on the "directness of the relationship between the means and the ends of the fraud," as opposed to the intent of the fraudster. *Id.* at 365 n.8. Essentially, the misrepresentation or fraudulent act needs

9

to be directly tied to the attempted acquisition of bank property. *Id.* at 362-63. So, while this nexus requirement would be met "when a defendant makes a misrepresentation to the bank itself—say, when he attempts to cash, at the teller's window, a forged or altered check," it is not met when "no false statement will ever go to a financial institution, the fraud is not the means of obtaining bank property." *Id.* at 363, 365.

The Indictment sufficiently alleges Defendants' false statements were the means by which Defendants induced the banks to part with their property. The Indictment specifically alleges, *inter alia*: (1) Defendant Motovich "instructed his [check-cashing business] customers to make out the checks to shell companies that had no legitimate business or services and were created solely to facilitate the illegal check-cashing scheme," *id.* ¶ 11; *see also id.* ¶ 14; (2) "[w]hen opening the Shell Company Bank Accounts and while each such account as open, [Defendant] Motovich . . . made numerous materially false representations to each of the Banks, including falsely representing the identity of the accounts' beneficial owner, the nature of the Shell Companies' businesses and the business rationales for certain transactions," *id.* ¶ 16; (3) Defendant Motovich "deposited more than $55 million into the Shell Company Bank Accounts" and "used some of the funds deposited into the Shell Company Bank Accounts to, among other things, purchase real estate, make payments towards personal and corporate credit card accounts, [and] purchase luxury items collectively worth millions of dollars," *id.* ¶ 17; (4) Defendant Motovich "together with others, opened the Shell Company Bank Accounts in the names of other individuals" "[t]o conceal [Defendant] Motovich's control of the Shell Companies and Shell Company Bank Accounts and to avoid detection of the illegal check-cashing scheme," *id.* ¶ 20; and (5) Defendants opened at least one shell company bank account in another individual's name, *id.* ¶ 21. *See also id.* ¶¶ 13, 15, 30-33, 38-39. These alleged misrepresentations regarding

10

the purpose of the Shell Company Bank Accounts, the beneficial owners thereof, and the purposes of the transactions were not only designed to hide Defendants' criminal activities and facilitate the opening and utilization of the Shell Company Bank Accounts, but were made directly to the banks themselves. This meets § 1344(2)'s "by means of" requirement. *See Loughrin*, 573 U.S. at 363. Indeed, in *United States v. Lebedev*, the Second Circuit upheld a bank fraud conviction upon finding "there was sufficient evidence showing that Lebedev caused false information to be sent to financial institutions to disguise the fact that their customers were transacting business with an unregistered Bitcoin exchange" "with the intent to obtain funds under those institutions' custody and control; namely, funds in the customers' accounts." 932 F.3d 40, 49 (2d Cir. 2019), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023). Following *Lebedev*'s reasoning, Judge Kaplan recently upheld a bank fraud conspiracy charge after finding the indictment sufficiently alleged a "nexus between the alleged misrepresentations, which induced Bank-1 to open an account, and the withdrawal of funds from the bank's custody" where the Indictment "allege[d] that the defendant conspired to send false information to a financial institution to disguise the true nature of an account and to obtain funds from that account that were in the custody and control of the financial institution." *Bankman-Fried*, 680 F. Supp. 3d at 306-07.[2]

Finally, Defendants assert the Bank Fraud Counts must be dismissed because they are predicated on the now-invalidated "right-to-control" theory of fraud. *See Ciminelli v. United States*, 598 U.S. 306 (2023). The right-to-control theory of fraud refers to "a cognizable harm

---

[2] Upon Defendant Bankman-Fried's conviction for wire fraud, wire fraud conspiracy, securities fraud conspiracy, commodities fraud conspiracy, and money laundering conspiracy, Judge Kaplan sentenced Defendant Bankman-Fried to 300 months of imprisonment. Judgment at 3, *United States v. Bankman-Fried*, 22-CR-673, ECF No. 373 (filed on Mar. 29, 2024).

[that] occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Id.* at 313 (quoting *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)). In *Ciminelli*, the Supreme Court held the right-to-control theory "cannot form the basis for a conviction under the federal fraud statutes." *Id.* at 316. Instead, the federal fraud statutes "protect property rights only," thereby requiring money or property to be the object of a defendant's fraud. *Id.* at 312 (cleaned up).

Even assuming *arguendo* that *Ciminelli*'s holding regarding the federal wire fraud statute applies in the bank fraud context, it would not apply in this case. The Indictment does not allege a right-to-control theory, instead alleging the object of Defendants' bank fraud offenses was bank property, i.e., funds in the Shell Company Bank Accounts. *See* Indictment ¶ 31; *see also id.* ¶¶ 11, 13-17, 20-22. As succinctly explained in *United States v. An*: "*Ciminelli* did not reject the premise that depriving a victim in order to induce the victim to part with traditional property can be fraud. *Ciminelli* simply rejected the notion that *information itself can be property*." 22-CR-460, ECF No. 171, at *25. As such, this Court joins a number of in-Circuit colleagues in rejecting Defendants' attempts to improperly weaponize *Ciminelli*'s holding. *See, e.g., id.* at *21-22 (explaining *Cimenelli* was inapplicable where "the Indictment . . . frames the harm to the banks as the Ans' deprivation of deposited funds in accounts held by the victim banks" rather than any informational harm); *United States v. Runner*, 18-CR-0578, 2023 WL 3727532, at *2 (E.D.N.Y. May 30, 2023) (Seybert, J.) ("[T]he Government's theory is that Defendant intended to and tangibly harmed victims by causing money and personal property to be sent in response to psychic mail solicitations, which contained material misrepresentations as to the nature of the bargain. Defendant cannot use *Ciminelli* as a shield to prevent the Government from introducing

12

the misrepresentations or omissions underlying the alleged scheme to defraud under the guise of construing those same deceptions as exclusively relevant to a victim's property interest to 'mere information' to render them unactionable."); *United States v. Mansouri*, 22-CR-34, 2023 WL 8430239, at *3 (W.D.N.Y. Dec. 5, 2023) (Vilardo, J.) ("Indeed, unlike the *Ciminelli* Indictment, the indictment here says nothing about depriving lenders or the SBA of their 'right to control' property."); *see also Bankman-Fried*, 680 F. Supp. 3d at 305; *United States v. Aronov*, 19-CR-408, 2024 WL 554577, at *3-4 (E.D.N.Y. Feb. 12, 2024) (Brodie, C.J.); *United States v. Pierre*, 22-CR-19, 2023 WL 4493511, at *15 (S.D.N.Y. July 12, 2023) (Gardephe, J.).

### C.   Legal Sufficiency of Aggravated Identity Theft Count

The Court denies Defendants' motion to dismiss the Aggravated Identity Theft Count for failing to state an offense.  18 U.S.C. § 1028A defines aggravated identity theft as "knowingly transfer[ring], possess[ing], or us[ing], without lawful authority, a means of identification of another person" "during and in relation to" certain felonies, including bank fraud and bank fraud conspiracy.  As explained in *Dubin v. United States*:

> A defendant "uses" another person's means of identification "in relation to" a predicate offense when this use is at the crux of what makes the conduct criminal.  To be clear, being at the crux of the criminality requires more than a causal relationship, such as "'facilitation'" of the offense or being a but-for cause of its "success." . . . Instead, with fraud or deceit crimes like the one in this case, the means of identification specifically must be used in a manner that is fraudulent or deceptive.  Such fraud or deceit going to identity can often be succinctly summarized as going to who is involved.

599 U.S. 110, 131-32 (2023) (internal citations omitted).  In *Dubin*, a healthcare fraud case pertaining to overbilling, the Court found the "use of the patient's name was not at the crux of what made the underlying overbilling fraudulent;" rather, the "petitioner's fraud was in representing *how* and *when* services were provided to a patient, not *who* received the services."

13

*Id.* at 132. As such, the use of the patient's identity was not "in relation to a predicate offense" under the Aggravated Identity Theft statute. *Id.*

The Aggravated Identity Theft Count properly states an offense, as it tracks the statutory language, properly states the time and place of the offense, and even identifies the victim using a fictitious name. Indictment ¶ 39 ("In or about and between April 2016 and December 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, [Defendants] . . . during and relation to the crimes charged in Count Three and Seven, did knowingly and intentionally possess and use, without lawful authority, means of identification of another person, to wit: John Doe 1, knowing that the means of identification belonged to John Doe 1."); *see also id.* ¶ 38 (incorporating factual background allegations in paragraphs one through 25). Indeed, the Indictment specifically alleges Defendants "opened a Shell Company Bank Account . . . for a Shell Company . . . in the name of John Doe 1 at Bank 1 without John Doe 1's knowledge or consent." *Id.* ¶ 21.

Contrary to Defendants' assertions, the Aggravated Identity Theft Count meets *Dubin*'s requirement that the identity theft be at the crux of what made Count Three (bank fraud) and Count Seven (bank fraud conspiracy) fraudulent: when opening and using the Shell Company Bank Account at Bank 1, Defendants, *inter alia*, allegedly misrepresented who the beneficial owner of the account was. *See id.* ¶¶ 21, 39. In other words, the Indictment alleges Defendants used John Doe 1's identity in relation to fraud crimes "in a manner that is fraudulent or deceptive" because it went "to 'who' is involved." *See Dubin*, 599 U.S. at 132 (footnote omitted); *cf. id.* ("Here, petitioner's use of the patient's name was not at the crux of what made the underlying overbilling fraudulent. The crux of the healthcare fraud was a misrepresentation

14

about the qualifications of petitioner's employee.  The patient's name was an ancillary feature of the billing method employed.").

### D.    Factual Sufficiency of the Bank Fraud and Aggravated Identity Theft Counts

"To the extent [a defendant] seeks to challenge the truth of the allegations in the Indictment or the sufficiency of the Government's evidence, this presents a factual question that cannot be decided on a motion to dismiss." *Aronov*, 2021 WL 2351175, at *4.  The "extraordinarily narrow" exception to the general prohibition on addressing the sufficiency of the evidence only applies when the Government has made "a 'detailed presentation of the entirety of the evidence.'" *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018) (quoting *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998)); *see also Alfonso*, 143 F.3d at 776-77 ("Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial to satisfy the jurisdictional element of the offense, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.").

Insofar as Defendants argue the Indictment is factually insufficient as to either the Bank Fraud or Aggravated Identity Theft Counts, the Court rejects these arguments. *See* Mot. to Dismiss Reply at 1-2.  Defendants appear to advance two contradictory arguments pertaining to factual insufficiency.  On the one hand, Defendants argue the Government purportedly made something akin to a "full proffer" of the evidence in its speaking Indictment, thereby "permit[ting] the Court to consider whether the facts, as alleged on the face of the Indictment, satisfy the statutory definition of a crime." *Id.* at 2 (quoting *United States v. Benjamin*, No. 21-CR-706, 2022 WL 17417038, at *16 (S.D.N.Y. Dec. 5, 2022), *rev'd on other grounds*, 95 F.4th 60 (2d Cir. 2024)).  On the other hand, in arguing for the purported legal insufficiency of the Aggravated Identity Fraud Count, Defendants argue evidence produced during discovery *not*

15

*referenced or included in the Indictment* undermines the allegations in the Indictment. *See, e.g.,* Mot. to Dismiss at 23-24. Given this evidence produced during discovery not referenced or included in the Indictment, the Court declines to find the speaking Indictment in this case could be fairly considered a full proffer of the evidence the Government intends to present at trial. *See An*, 22-CR-460, ECF No. 171 at *31 ("Because the Government has not made a full pre-trial proffer of the evidence it intends to introduce at trial[] . . . [the defendants'] challenge to the sufficiency of the [i]ndictment and the Government's evidence cannot succeed."); *Sampson*, 898 F.3d at 282 ("[T]he Government must make a 'detailed presentation of the entirety of the evidence' before a district court can dismiss an indictment on sufficiency grounds.") (quoting *Alfonso*, 143 F.3d at 777); *see also id.* at 285 ("[W]e simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be.") (quoting *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000)). Therefore, to the extent Defendants raise a factual sufficiency challenge to the Indictment, the Court rejects those arguments.

The Indictment as written—and taken as true on a motion to dismiss—meets the elements of bank fraud, conspiracy to commit bank fraud, and aggravated identity theft. The Court will not consider Defendants' arguments—or Defendant Markovics' Counterstatement of Facts, ECF No. 204—that other evidence contradicts the facts alleged in the Indictment. *See Aronov*, 2021 WL 2351175, at *4 ("To the extent [a defendant] seeks to challenge the truth of the allegations in the Indictment or the sufficiency of the Government's evidence, this presents a factual question that cannot be decided on a motion to dismiss.").

## III.   MOTIONS TO SUPPRESS MATERIALS SEIZED FROM MIDWOOD LUMBER AND DEFENDANT MOTOVICH'S iCLOUD ACCOUNT

### A.   Midwood Lumber and iCloud Warrants

16

On April 7, 2020, Magistrate Judge Cheryl L. Pollack issued a search warrant authorizing the search and seizure of materials from Defendant Motovich's iCloud account ("iCloud Warrant"). *See* iCloud Warrant, ECF No. 194-3; *see also* iCloud Warrant Affidavit, ECF No. 194-4. The iCloud Warrant authorized the seizure of all information from Defendant Motovich's iCloud account "that constitutes fruits, contraband, evidence and instrumentalities of violations of (1) Title 18, United States Code, Section 1956(h) (conspiracy to launder monetary instruments); (2) Title 18, United States Code, Section 1960 (unlicensed money remittance); (3) Title 18, United States Code, Sections 1346 and 1349 (wire fraud and conspiracy to commit wire fraud); (4) Title 18, United States Code, Sections 1344 and 1349 (bank fraud and conspiracy to commit bank fraud; (5) Title 18 United States Code, Section 1028A (aggravated identity theft); and (6) Title 26, United States Code, Sections 7201 (income tax evasion) and 7202 (payroll tax evasion) (the 'Subject Offenses') involving David Motovich, Boris Motovich, Gail Motovich, Kemal Sarkinovic, Marina Kuyan, Joshua Markovics, Menachem Markovics, Lyumilda Motovich, Robert Lovy and other individuals known and unknown, occurring between January 1,2012 [sic] and February 1, 2019," including a number of illustrative categories of materials. iCloud Warrant Attach. B-3, Sec. II. According to the warrant, this information includes, *inter alia*: records related to the creation of, bank accounts—including transactions therewith—held in the name of, ownership and control of, transactions involving, and documents created in the name of the Shell Companies; "[e]vidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;" "[e]vidence indicating the email account owner's state of mind as it relates to the crime under investigation;"

and "the identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s)." *Id.* Attach. B-3, Sec. II ¶¶ (a), (j)-(l).

On August 23, 2021, Magistrate Judge Roanne L. Mann issued a search warrant authorizing the search and seizure of materials from Midwood Lumber ("Midwood Lumber Warrant"). *See* Midwood Lumber Warrant, ECF No. 194-1; *see also* Midwood Lumber Affidavit, ECF No. 194-2. The Midwood Lumber Warrant authorized the seizure of: "[a]ll records relating to violations of Title 18, United States Code, Sections 371 (conspiracy against the United States), 1028A (aggravated identity theft), 1344 (bank fraud), 1349 (bank fraud conspiracy), 1956 (money laundering) and 1957 (laundering criminal proceeds in amounts greater than $10,000) (collectively, the 'Subject Offenses'), those violations involving David Motovich, Marina Kuyan, Kemal Sarkinovic, Gail Kastner, and Joshua Markovics and occurring after January 1, 2012," including approximately 20 illustrative categories of materials. Midwood Lumber Warrant Attach. B1 ¶ 1. Some of those categories include: (a) records and information related to companies used by Defendant Motovich, as well as "[r]ecords relating to all financial transactions involving the Shell Companies and/or Shell Company Bank Accounts;" (b) records and physical objects "that may constitute fruit or evidence of the use of the funds in the Shell Company Bank Accounts," including "all American Express statements, and all other billing statements, receipts and correspondence relating to all clothing, jewelry, watches, life insurance policies, loan documents, promissory notes and any other objects and documents referenced in the supporting affidavit;" (c) "[r]ecords related to [Midwood Lumber's] sales and inventory;" and (d) for any computer subject to the warrant or otherwise containing information subject to the warrant, "evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries,

18

configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, 'chat,' instant messaging logs, photographs, and correspondence." *Id.* Attach. B1 ¶¶ 1(a)-(c), (h), (i).

### B.    Particularity and Overbreadth

#### 1.    Legal Standard

"[T]he Fourth Amendment provides that 'a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)). The probable cause requirement is met "where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)). "This required nexus between the items sought and the 'particular place' to be searched protects against the issuance of general warrants." *Id.* (quoting *Stanford v. State of Tex.*, 379 U.S. 476, 481 (1965)).

"A warrant[] . . . can be unconstitutionally infirm in two conceptually distinct but related ways: either by seeking specific material as to which no probable cause exists," meaning the warrant is overbroad, "or by giving so vague a description of the material sought as to impose no meaningful boundaries," meaning the warrant lacks particularity. *United States v. Cohan*, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009) (Block, J.).

To satisfy the Fourth Amendment's particularity requirement, a warrant must: (1) "identify the specific offense for which the police have established probable cause;" (2) "describe the place to be searched;" and (3) "specify the items to be seized by their relation to designated crimes." *Galpin*, 720 F.3d at 445-46. The particularity inquiry requires the Court to

19

determine "whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *United States v. Hernandez*, 09-CR-625, 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) (Baer, J.); *see also United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) ("A warrant must be sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize.") (cleaned up). The Second Circuit has held "broadly worded categories of items available for seizure" do not necessarily render a warrant deficient. *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990). However, "catch-all" categories authorizing searches for "'evidence of *a* crime,' that is to say, any crime, is so broad as to constitute a general warrant" in violation of the Fourth Amendment. *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992); *see also id.* ("Mere reference to 'evidence' of a violation of a broad criminal statute or general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize.").

Overbreadth, on the other hand, arises when a warrant "is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (Briccetti, J.) (quoting *Galpin*, 720 F.3d at 446); *see also United States v. Wey*, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017) (Nathan, J.) ("The doctrine of overbreadth represents, in a sense, an intersection point for probable cause and particularity principles: it recognizes, in pertinent part, that a warrant's unparticularized description of the items subject to seizure may cause it to exceed the scope of otherwise duly established probable cause."). This is not to say all far-reaching warrants are impermissible. "A warrant permitting fairly broad types of materials is permitted if the affidavit in support of the search warrant application provides the necessary basis for a determination of probable cause to seize items in each of these categories."

20

*United States v. Zemlyansky*, 945 F. Supp. 2d 438, 464 (S.D.N.Y. 2013) (Oetken, J.) (cleaned

up); *see also United States v. Purcell*, 967 F.3d 159, 179 (2d Cir. 2020) ("[A] broad warrant

allowing the government to search [the defendant's] laptop for potentially extensive evidence of

charged crimes committed using that laptop does not offend the Fourth Amendment, as long as

that warrant meets the three particularity criteria.") (quoting *United States v. Ulbricht*, 858 F.3d

71, 100, 102-03 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 585

U.S. 296 (2018)) (internal quotation marks omitted)) (second alteration in original).

 As explained in *Zemlyansky*:

> In determining whether a warrant is overbroad, courts must focus on
> "whether there exists probable cause to support the breadth of the
> search that was authorized." *Hernandez*, 2010 WL 26544, at
> *8 (citation omitted). "The magistrate's determination that probable
> cause exists is entitled to 'great deference,' and the task of the
> reviewing court 'is simply to ensure the magistrate had a substantial
> basis' for that determination." *Id.* (citation omitted).

945 F. Supp. 2d at 464.

  **2.** **Application**

 The Court finds both the iCloud and Midwood Lumber Warrants were sufficiently

particularized and tethered to the Affidavits's probable cause showings, thereby meeting the

Fourth Amendment's requirements.

 Both Warrants satisfy the Fourth Amendment's particularity requirements set out in

*Galpin*. First, both Warrants "identify the specific offense for which the police have established

probable case," *Galpin*, 720 F.3d at 445, with each identifying specific "Subject Offenses" to

which any records seized much relate. Midwood Lumber Warrant Attach. B1 ¶ 1(identifying

conspiracy against the United States, aggravated identity theft, bank fraud, bank fraud

conspiracy, money laundering, and laundering criminal proceeds in amounts greater than

$10,000 as "Subject Offenses"); iCloud Warrant Attach B-3, Sec. II (identifying conspiracy to launder monetary instruments, unlicensed money remittance, wire fraud and conspiracy to commit wire fraud, bank fraud and conspiracy to commit bank fraud, aggravated identity theft, income tax evasion, and payroll tax evasion as "Subject Offenses").  Second, both Warrants "describe the place to be searched," *Galpin*, 720 F.3d at 445-46:  the Midwood Lumber Warrant identifies the property to be searched as Midwood Lumber & Millwork Inc. by address, description, and picture, Midwood Lumber Warrant Attach. A1, and the iCloud Warrant identifies the property to be searched as "information associated with" Defendant Motovich's Apple ID, iCloud Warrant Attach. A-3.  Third, both Warrants "specify the items to be seized by their relation to designated crimes," *Galpin*, 720 F.3d at 446, with each warrant providing illustrative categories of items to be seized limited to evidence of the subject offenses.  Indeed, those categories are further limited by a requirement that the items seized be limited to a specific time period and involve certain individuals.   Midwood Lumber Warrant Attach. B1 (identifying as property to be seized "[a]ll records relating to [the Subject Offenses], those violations involving David Motovich, Marina Kuyan, Kemal Sarkinovic, Gail Kastner, and Joshua Markovics and occurring after January 1, 2012, including" illustrative search categories); iCloud Warrant Attach. B-3, Sec. II ("All information described above in Section I that constitutes fruit, contraband, evidence, and instrumentalities of violations of [the Subject Offenses] involving David Motovich, Boris Motovich, Gail Motovich, Kemal Sarkinovic, Marina Kuyan, Joshua Markovics, Menachem Markovics, Lyumilda Motovich, Robert Lovy and other individuals known and unknown, occurring between January 1, 2012 and February 1, 2019, including[] . . . information pertaining to" illustrative search categories).

Defendants' arguments regarding the Warrants' lack of particularity are unavailing. *See, e.g.*, Mot. to Dismiss at 18 n.7; Omni. Reply at 2. As to Defendants' objections to the nearly ten-year timeframe of the Midwood Lumber Warrant,, such a timeframe was supported by the Midwood Warrant Affidavit's allegation "that since at least 2012, [Defendant] Motovich, together with others, has operated an illegal check cashing operation from" Midwood Lumber, Midwood Lumber Affidavit ¶ 9; *see also id.* at ¶¶ 7, 12, 18, 21-22, 39. The iCloud Affidavit's allegations similarly supported the iCloud Warrant's authorization to seize information regarding offenses "occurring between January 1,2012 [sic] and February 1, 2019." *Compare* iCloud Warrant Attach. B-3, Sec. II *with* iCloud Warrant Affidavit ¶ 40 ("CW 1 advised that, for a period of several years beginning at least as early as January 2012, he would obtain cash from [Defendant] Motovich in the following manner.") *and id.* ¶¶ 43, 47, 49, 51-54, 57-58, 60. As such, "it is reasonable that the [Warrants] would go back to" 2012. *See United States v. Chang*, 18-CR-00681, 2024 WL 1308775, at *16 (E.D.N.Y. Mar. 27, 2024) (Garaufis, J.).[3]

Regarding the purported breadth of the Subject Offenses providing limited guidance to agents in executing the search warrant rendering the Warrants insufficiently particular, *see, e.g.*, Omni. Reply at 2-3, 8, the Court rejects these arguments.[4] Unlike the Warrants here, neither of the warrants held unconstitutional in *United States v. Wey*, 256 F. Supp. 3d 355, 384-85 (S.D.N.Y. 2017) (Nathan, J.) and *Zemlyansky*, 945 F. Supp. 2d at 456-57, included references to the offenses under investigation for most if not all search categories. Moreover, numerous other courts in this Circuit have found warrants to be sufficiently particularized even when the crimes

---

[3] For these same reasons, the timeframes authorized in the Warrants do not render the warrant overbroad. *See supra* at 19-20.

[4] While Defendants also framed these arguments as pertaining to overbreadth, *see* Mot. to Dismiss at 9, 18 n.7, they are more properly considered in the particularity analysis.

referenced are "broad." *See, e.g.*, *Hernandez*, 2010 WL 26544, at *10 ("The search warrant

itself indicates that only documents related to violations of various criminal fraud statutes related

to identity, mail, and tax fraud [may be seized]."); *United States v. Dupree*, 781 F. Supp. 2d 115,

149-50 (E.D.N.Y. 2011) (Matsumoto, J.) ("Accordingly, the warrant explicitly made clear to the

executing officers that the offenses being investigated in this case are mail, wire, and bank fraud,

and attempts and conspiracy to commit the same, pursuant to 18 U.S.C. §§

1341, 1343, 1344 and 1349 and that the items to be searched and seized were evidence of those

offenses."); *United States v. Russo*, 483 F. Supp. 2d 301, 307 (S.D.N.Y. 2007) (Robinson, J.)

("Here the warrants in question identify various large classes of materials, but identify the

specific activities (frauds) and criminal statutes (18 U.S.C. §§ 1343, 1349, 1956, and 1957)

which the materials evidence.  Accordingly, the Court finds that the warrant is not overbroad and

satisfies the particularity requirement of the Fourth Amendment.").

Finally, the Court rejects Defendants' assertions regarding the purported vague

categories identified in the Warrants. *See, e.g.*, Omni. Mot. at 11-13, 18-19.  While a number of

these categories are broad, such broad categories are permissible, especially when otherwise

subject to individual, temporal, and criminal offense limitations and in an otherwise complex

case. *See, e.g*, *Russo*, 483 F. Supp. 2d at 307 ("Generic terms may be used to describe the

materials to be seized so long as the warrant identifies a specific illegal activity to which the item

related."); ; *United States v. Chang*, 18-CR-00681, 2024 WL 1308775, at *15 (E.D.N.Y. Mar.

27, 2024) (Garaufis, J.) (upholding warrant as sufficiently particularized when the "expansive"

list of materials on an individual's phone "denotes that each of the five listed types of records

and information must 'relate to violations'" of the offenses).  Far from being "ill-defined

categories that allow agents freewheeling discretion," Omni. Reply at 3, each of these categories

24

provides meaningful guidance to executing agents in exercising their judgment as to the types

and categories of items to be seized, particularly in light of the temporal, individual, and offense

limitations described above. *See United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990)

(upholding warrant which "supplied sufficient examples of the type of records that could be

seized," and noting, while "the description, even with illustrations, did not eliminate all

discretion of the officers executing the warrant," "the particularity requirement is not so

exacting.").

As to overbreadth, the Court finds the Midwood Lumber and iCloud Warrants are not

overbroad.  Defendants specifically take issue with the following search categories as going

beyond the Midwood Lumber Affidavit's probable cause showing:  (1) "Records relating to

Midwood Lumber & Millwork Inc.'s sales and inventory;" and (2) "For any computer or storage

medium whose seizure is otherwise Authorized," permitting seizure of "evidence of who used,

owned, or controlled the computer at the time the things described in this warrant were created,

edited, or deleted, such as . . . documents, browsing history, user profiles, email, email contacts,

'chat,' instant messaging logs, photographs, and correspondence."  Omni. Mot. at 8-9 (quoting

Midwood Lumber Warrant) (internal quotation marks omitted); *see also id.* at 6 (noting the

Midwood Lumber Warrant includes a catch-all category allowing the seizure of "contextual

information necessary to understand the evidence" otherwise seized).  Defendants argue "while

the allegations in the Midwood Lumber Warrant Affidavit may provide probable cause to search

some of the business' records for evidence of the check cashing and attendant conduct involving

the alleged 'Shell Companies,' it does not provide probable cause for the comprehensive

categories of materials covered by the Midwood Lumber Warrant," as "[s]eemingly all of the

business' sales and inventory records, and reams of business employees' electronic

25

communications and documents, were subject to seizure, with little references to the specific factual allegations under investigation." *Id.* at 11. Defendants similarly challenge the iCloud Warrant's authorization of "several ill-defined categories of materials" "such as: [(1)] 'Evidence indicating how and when the email account was accessed or used;' '(2) Evidence indicating the email account owner's state of mind as it relates to the crimes under investigation;' and '(3) The identity of the person(s) who created or used the user ID.'" *Id.* at 16 (quoting iCloud Warrant). According to Defendants, the iCloud Warrant facially "permits seizure from this personal iCloud account of vague categories of materials that encompassed all manner of [Defendant] Motovich's personal materials." *Id.* at 17.

The Court disagrees. As a preliminary matter, as discussed above, all the search categories were limited to records pertaining certain Subject Offenses involving particular people during a particular time period, and Defendants do not dispute the Warrants were supported by probable cause showings. *See* Omni. Mot. at 3 ("Both warrants purported to authorized sweeping seizure of records *extending far beyond the probable cause showings* regarding alleged unlicensed money transmission and related crimes[] . . . .") (emphasis added). This alone undermines Defendants' arguments as to the Warrants' overbreadth, as far from permitting agents to "root[] around and seiz[e] virtually any and all of Midwood Lumber's business documents," Omni. Mot. at 8, or "seiz[e] from this personal iCloud account of vague categories of materials that encompassed all manner of [Defendant] Motovich's personal materials," *id.* at 17, all of the illustrative search categories are tied to the offenses for which Defendants do not dispute there is probable cause. *See United States v. Pugh*, 15-CR-00116, 2015 WL 9450598, at *21 (E.D.N.Y. Dec. 21, 2015) (Garaufis, J.) ("Judge Orenstein properly found probable cause to

search Pugh's devices for evidence of a Section 2339A violation; thus, the warrant would only be overbroad if it permitted a search for evidence unrelated to that crime.  It does not.").

Beyond the aforementioned temporal, offense, and individual limitations of the Warrants' illustrative search categories, the search categories Defendants challenge are properly tethered to the Warrants' probable cause showings.  As to the Midwood Lumber Warrant's authorization to seize "[r]ecords relating to Midwood Lumber & Millwork Inc.'s sales and inventory," Midwood Lumber Warrant Attach. B1 ¶ 1(h), the Midwood Lumber Affidavit asserts, based on information from a confidential source, Defendant Motovich offered a 10% discount on construction materials if the confidential source purchased the materials in cash.  Midwood Lumber Affidavit ¶ 23; *see also id.* ¶ 24.  The Midwood Lumber Affiant stated, based on his training, experience, and review of the relevant records, Defendant Motovich's "off-the-books, cash sales of construction materials is the main source of the cash that [Defendant] Motovich provides his illegal check-cashing customers." *Id.* ¶ 23.  The Midwood Lumber Affiant further asserted:  (1) these types of off-the-books transactions would be recorded separately from Midwood Lumber's main point-of-sale computer systems and business sale's software; and (2) construction supplies sold in off-the-books cash transactions would be recorded "as missing or damaged," thereby "permit[ting] the business to write off the loss on its taxes." *Id.*  Moreover, the Midwood Lumber Affiant states "[t]he [confidential source] has not made any such cash payments at the cash register at" Midwood Lumber, instead completing such cash transactions with Defendant Motovich on the second floor of Midwood Lumber. *Id.* ¶ 24; *see also id.* ¶ 25.  Not only is this category limited to evidence of the Subject Offenses, but it is also supported by specific allegations in the Midwood Warrant Affidavit. *Id.* ¶¶ 23-25.

The Court agrees with the Government that the Midwood Lumber Affidavit demonstrates "the point-of-sale computer system and inventory would, among other relevant evidence, likely yield evidence of the discrepancy between the records of 'legitimate' sales at Midwood Lumber as opposed to the illicit cash business taking place at the same location," Gov't Opp. at 44, with such evidence supporting the establishment of criminal activity, including the Midwood Lumber Warrant's Subject Offenses.  While Defendants attempt to discredit the Midwood Lumber Affiant's opinion regarding where off-the-books cash transactions would be recorded by pointing to *United States v. Falso*, 544 F.3d 110, 124 (2d Cir. 2008), that child pornography case is distinguishable.  *See* Omni. Mot. at 8-9 n.3.  In contrast to the *Falso* affidavit's "generalized allegations" against the defendant in that case, the Midwood Lumber Affidavit's allegations properly "establish the requisite nexus of illegal activity" to Midwood Lumber's sales records. *United States v. Falso*, 544 F.3d 110, 124 (2d Cir. 2008) ("Generalized allegations about: (1) the propensity of collectors of child pornography to intentionally maintain illegal images; (2) law enforcement's ability to retrieve such images from a computer; and (3) the ability to view child pornography on [a] website, fail to establish the requisite nexus of illegal activity to Falso. Although Falso might hoard images of child pornography *if* he viewed and downloaded them, there is no allegation in the affidavit that he was in a position, or was otherwise inclined, to do so.").  As such, the Court finds there was a substantial basis for the magistrate judge to determine there was probable cause authorizing this search category.

As to the Midwood Lumber Warrant's authorization to search Midwood Lumber's computers or storage mediums pertaining to Midwood Lumber's server for "evidence of who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted," Midwood Lumber Warrant Attach. B1 ¶ 1(i)(i), the Court finds the

magistrate judge had a substantial basis to determine there was probable cause for such a search category. First, Defendants' arguments that this search category was not limited "to communications involving the check cashing and related crimes specified in the Midwood Lumber Warrant," Omni. Mot. at 8, is contravened by the Midwood Lumber Warrant itself. The Midwood Lumber Warrant is structured such that each search category is a subset of, and therefore modified by, the temporal, offense, and individual limitations of Paragraph 1 of Attachment B1 of the Midwood Lumber Warrant, which specifically circumscribe the categories to records relating to the Subject Offenses. *See* Midwood Lumber Warrant Attach. B1 ¶ 1. Second, the Midwood Lumber Affiant specifically outlines the rationale for seizing the relevant computers, noting the "application seeks permission to search for records that might be found [in Midwood Lumber], in whatever form they are found," which includes records found on computers or other storage. Midwood Lumber Affidavit ¶ 42. The Midwood Lumber Affiant further ties these computers and other storage mediums to the allegations of criminal activities, noting a "review of search warrant returns of Motovich's iCloud account contains photographs of what appears to be an Apple laptop screen with the screen open to financial statements from his American Express accounts, which, as described above has been paid off using money from the Shell Company Bank Accounts. *Id.* ¶ 43; *see also id.* ("I am also aware that Motovich's secretary, Marina Kuyan, sent various fraudulent insurance certificates via email using what appears to be a personal email account. Finally, I am also aware from communications with Epicor that Midwood Lumber uses a point-of-sale system made by Epicor, which is operated off of a local server and is used to record the business's transactions."); *id.* ¶ 45 (asserting "that if a computer or storage medium is found in [Midwood Lumber], there is probable cause to believe those records will be stored on that computer or storage medium," listing a number of reasons for

29

such a submission); *id.* ¶ 46.  Third, the Midwood Lumber Affidavit identifies specific categories of computers it sought authorization to seize and/or image, and the Midwood Lumber Warrant is similarly limited.  *Compare* Midwood Lumber Affidavit ¶ 44 *with* Midwood Lumber Warrant Attach. B1 ¶ 1(i) n.5.  Fourth, the Midwood Lumber Affiant identifies the rationale for authorizing data about "who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted," specifically noting, *inter alia,* "'user attribution' evidence is analogous to the search for 'indicia of occupancy' while executing a search warrant at a residence" and can enable the Government to both prove the relevant crime and "exclude the innocent from further suspicion."  Midwood Warrant Affidavit ¶ 46(b); *see generally id.* ¶¶ 46(a)-(b).  The Court therefore finds there was a substantial basis for the magistrate judge to authorize this search category.

Defendants' overbreadth arguments to certain iCloud Warrant search categories fare no better.  First, as noted above, each search category is tethered to the temporal, individual, and subject offense limitations outlined in the introductory paragraph of the iCloud Warrant.  *See* iCloud Warrant Attach. B-3, Sec. II.  As such, contrary to Defendants' arguments, the iCloud Warrant did not facially allow the Government to seize "vague categories of materials that encompassed all manner of [Defendant] Motovich's personal materials," instead limiting the search categories to, *inter alia*, evidence of the stated crimes.  *See* Omni. Mot. at 17.  Indeed, two of the challenged search categories include a further specific limitation that the information should be relating to the crime under investigation.  iCloud Warrant Attach. B-3, Sec. II ¶ (j) ("Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events *relating to the crime under investigation* and to the email account owner.") (emphasis added); *id.* Attach. B-3 Sec. II

(k) ("Evidence indicating the email account owner's state of mind *as it relates to the crime under investigation*.") (emphasis added).

Second, the challenged categories are tethered to the iCloud Warrant Affidavit's probable cause showing. Similar to the Midwood Lumber Warrant Affidavit, the iCloud Warrant Affidavit addresses the rationale for seizing information in each of the challenged categories. *See, e.g.*, iCloud Warrant Affidavit ¶ 89 ("[T]he user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This 'user attribution' evidence is analogous to the search for 'indicia of occupancy' while executing a search warrant at a residence. . . . Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation."); *id.* ¶ 90-91 (explaining stored electronic data and account activity may provide "relevant insight into the account owner's state of mind as it relates to the offense under investigation."). Based on this, the Court finds these search categories were not broader than the probable cause underlying the iCloud Warrant, and the magistrate judge had a substantial basis to determine there was probable cause authorizing these search categories.

## C.    Reasonable Execution

### 1.    Legal Standard

Government agents' conduct in executing a warrant is subject to the Fourth Amendment's reasonableness requirement. *United States v. Ganias*, 824 F.3d 199, 209-10 (2d Cir. 2016). "A search is presumptively reasonable when executed pursuant to a warrant. A search warrant issued by a neutral magistrate, upon a finding of probable cause, must be afforded great deference and creates a presumption that the officers executing the warrant acted in an

objectively reasonable fashion." *Merriweather v. City of New York*, 12-cv-5258, 2015 WL

57399, at *6 (S.D.N.Y. Jan. 5, 2015) (Fallo, J.).

"[W]hen items outside the scope of a valid warrant are seized, the normal remedy is

suppression and return of those items;" "the drastic remedy of the suppression of *all* evidence

seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the

warrant's terms." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). The Second

Circuit has explained "Government agents flagrantly disregard the terms of a warrant so that

wholesale suppression is required only when (1) they effect a widespread seizure of items that

were not within the scope of the warrant, and (2) do not act in good faith." *United States v. Shi*

*Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (cleaned up). For government agents' actions to meet

this first prong of flagrant disregard, "the search conducted by the government agents must

*actually resemble* a general search," which can take the form of "indiscriminate rummaging" or

"an exploratory search for items not mentioned" in the warrant. *Id.* at 141. "Even if a court

determines the Government flagrantly disregarded the terms of the warrant, it should only grant

blanket suppression after weighing the deterrent benefit of that remedy against the costs of

suppressing valuable evidence." *United States v. Messalas*, 17-CR-339, 2020 WL 4003604, at

*7 (E.D.N.Y. July 14, 2020) (Mauskopf, J.). Indeed, "courts in this district have rejected claims

for suppression on this basis so long as a majority of the documents seized were within the

warrant's scope and the search was otherwise executed in a reasonable fashion." *Id.* at *8.

### 2.    Application

Defendants argue for blanket suppression of all fruits of the Warrants based on their

purported unreasonable execution. Defendants argue Government agents seized "all manner of

records related to Midwood Lumber's business, including hundreds of [pages of] irrelevant

business information, such as employee information, payroll data, human resources materials, and individual transactions from customers without any connection to the alleged 'Shell Companies,'" "records pertaining to [Defendant] Motovich's businesses unrelated to Midwood Lumber," and personal documents and communications unrelated to the Midwood Lumber Warrant application, to include bar mitzvah preparation materials, Judaica, and health insurance records  Omni. Mot. at 6-7.  According to Defendants, it appears "the agents simply grabbed entire sets of papers and electronic records in executing the Midwood Lumber Warrant," and "there is no indication that the agents made any meaningful effort to identify those portions of the Midwood Lumber records responsive to the Warrant's seizure list." *Id.* at 7-8, 13.  As such, Defendants argue "the Midwood Lumber Warrant functioned as nothing more than a general warrant in flagrant disregard of the Fourth Amendment," thereby requiring general suppression of its fruits. *Id.* at 13.

Defendants further argue "[d]ozens of pages of seized documents and recordings [had] no connection to the iCloud Warrant's strictures, or indeed, the crimes or allegations at all," including "several dozen obviously irrelevant videos and images from [Defendant] Motovich's iCloud, depicting gatherings of [Defendant] Motovich's family and friends; identifications of his minor children; identifications of friends unrelated to the alleged crimes; news materials; lewd images; health insurance information, among others." *Id.* at 16.

As a preliminary matter, the Court agrees with the Government's assessment that, in their initial briefing, Defendants primarily invoked the purported overseizure in support of their particularity and overbreadth arguments. *See, e.g.*, Omni. Mot. at 1 (executing agents seized "thousands of pages of irrelevant materials" "because the warrants themselves purported to authorize seizure of vast categories of materials, ignoring the Fourth Amendment's probable

cause and particularity requirements.  The general nature of the searches and seizures warrant broad suppression."); Omni. Reply at 1 ("The government's widespread seizure of irrelevant and often personal material from Midwood Lumber and [Defendant] Motovich's iCloud account[] . . . starkly illustrate that the Warrants ran afoul of the Fourth Amendment.  On their face they were both overbroad, permitting seizure of materials far beyond the probable cause showing, and lacking in particularity by failing to clearly circumscribe agents' discretion to seize only hose [sic] materials supported by probable cause.") (footnote omitted); *see also* Omni. Mot. at 12, 13, 17, 19; Gov't Suppl. Suppr. Br. at 2 n.1, ECF No. 222.  While Defendants do cursorily challenge the Warrants' execution as unconstitutional, *see, e.g.*, Omni. Mot. at 13-14, 19; Omni. Reply at 7, the Court notes the contradiction between asserting executing agents flagrantly disregarded the terms of a warrant while also arguing that the terms of the warrant were the cause of such overseizure.

The Court finds the executing agents did not flagrantly disregard the Warrants' terms and denies Defendants' request for the "drastic remedy" of blanket suppression of their fruits.  *See Matias*, 836 F.2d at 747.  Defendants point to a number of purportedly irrelevant items as examples of overseizure.  *See* Exs. C and F to Motovich Omni. Mot., ECF No. 184-1; Defendant's Hearing Ex. A.  The Government disputes Defendants assertions regarding these documents' responsiveness.  *See, e.g.*, Gov't Opp. at 52-53 (arguing how numerous items in Exhibits C and F are within the Warrants' scope and relevant to the Government's investigation); Gov't Suppl. Suppr. Br. at 4-7 (asserting the items in Exhibits C, F, and Defendant's Hearing Ex. A are in fact responsive to the Warrants); Suppr. Hr'g Tr. at 72:11-80:25 (contending many items Defendants allege were improperly seized were in fact within the scope of the Warrants and responsive).

34

While the Government concedes some of the challenged documents are not responsive,

*see* Supp. Hr'g Tr. at 53:13-54:14, 54:20-25; Gov't Suppl. Suppr. Br. at 6, these concessions do

not turn presumptively reasonable searches executed pursuant to warrants into searches which

flagrantly disregarded the Warrants' terms. *See United States v. Nejad,* 436 F. Supp. 3d 707, 736

(S.D.N.Y. 2020) (Nathan, J.) ("That some much smaller number of the 3,000 documents the

Government seized may be irrelevant is not, on its own, sufficient to establish that the

responsiveness review was unreasonable."). Indeed, even assuming *arguendo* all of the

documents identified by Defendants—which Defendants characterize as a subset of purportedly

overseized documents—were nonresponsive and outside of the scope of the Warrants, the Court

would still not find this to be the type of extraordinary circumstance warranting blanket

suppression. The Government has asserted "[t]he defense attachments are but a small sample of

the overwhelming evidence taken from the search locations, including Motovich's instructions

regarding conducting transactions in the Shell Company bank accounts, screenshots of online

banking related to the fraudulent accounts, copies of fraudulent insurance certificates and

communications with co-conspirators, to name just a few." Gov't Opp. at 51. Defendants do not

dispute this assertion, nor make any argument that the number of purportedly unresponsive

documents is in any way comparable to the number of unchallenged responsive documents. As

such, the Court declines to find, based on these documents seized, that the executing agents

flagrantly disregarded the Warrants' terms so as to justify blanket suppression. *See Dupree*, 781

F. Supp. 2d at 156-57 ("[E]ven if some of these documents were outside the scope of the

warrant, they do not outnumber the documents described in the warrant. The seizure of these

documents, therefore, does not evidence flagrant disregard of the terms of the warrant.");

*Messalas*, 2020 WL 4003604, at *8 ("Even assuming that Messalas's claim [that more than 40%

of seized hard copy documents were not responsive to the warrant] is correct, the Court is aware of no authority for ordering suppression on this basis alone, in the absence of additional evidence that the search was unreasonable. To the contrary, courts in this district have rejected claims for suppression on this basis so long as a majority of the documents seized were within the warrant's scope and the search was otherwise executed in a reasonable fashion.").

This conclusion is augmented by the undisputed digital search data proffered by the Government. The Government explains, during the search executed pursuant to the Midwood Lumber Warrant, "the government searched computers containing approximately 1,062,331 documents consisting of millions of pages," of which it marked approximately 0.4% responsive. Gov't Suppl. Suppr. Br. at 4. The Government further maintains Defendant Motovich's full iCloud report contained approximately 154 GB of data, less than 2.3 GB of which the Government marked as responsive. *Id.* at 6. Such a responsiveness rate further indicates these searches were not akin to "indiscriminate rummaging" or general searches executed in flagrant disregard of the Warrants' terms. *See, e.g.*, *Nejad*, 436 F. Supp. 3d at 735 ("The Court considers the entirety of the universe of documents deemed responsive in determining whether the responsiveness review was conducted reasonably. . . . The fact that the Government ultimately tagged as responsive fewer than [0.1% of the] documents from a review population of over one million documents indicates that the review was reasonable, and the reviewers were careful to cull from the review population only those documents that fell within the scope of the warrants."); *United States v. Garlick*, 22-CR-540, 2023 WL 2575664, at *12 (S.D.N.Y. Mar. 20, 2023) (Caproni, J.) ("As a general matter, the Government marked only 156 pages, or about 2 percent, of the records produced in response to the Google Warrant responsive, suggesting that it did not engage in the type of general search that would require wholesale suppression.").

36

Defendants dedicated a substantial portion of their argument at the suppression hearing and in their supplemental briefing arguing the Government should have had agents testify during that hearing, in essence asserting that without such testimony, the Court cannot decide Defendants' motion. The Court rejects these assertions. *See United States v. Barrios*, 210 F.3d 355, at *1 (2d Cir. 2000) (unpublished) ("A defendant moving for the suppression of evidence seized following a search is not automatically entitled to an evidentiary hearing unless he supports his motion with moving papers that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question, including an affidavit of someone alleging personal knowledge of the relevant facts.") (cleaned up); *Nejad*, 436 F. Supp. 3d at 738 (deciding portion of motion to suppress on the papers); Omni. Mot. at 1 (moving to suppress, *"or in the alternative hold a suppression hearing"* on, materials seized pursuant to the Warrants) (emphasis added).

Based on the Government's representations that it will not introduce non-responsive materials into evidence at trial, Gov't Suppl. Suppr. Br. at 2 ("[T]he government has represented, and again now represents, that it does not intend to use any nonresponsive items at trial."), the Court finds Defendants' motion to suppress any such non-responsive materials as moot.

## IV.    MOTION FOR A BILL OF PARTICULARS REGARDING COUNTS ONE THROUGH SEVEN AND COUNT SEVENTEEN

### A.    Legal Standard

A bill of particulars "inform[s] a defendant of charges with sufficient precision to allow preparation of a defense, to avoid unfair surprise, and to preclude double jeopardy." *United States v. GAF Corp.*, 928 F.2d 1253, 1260 (2d Cir. 1991). In the Second Circuit, a bill of particulars "is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Chen*, 378

37

F.3d 151, 163 (2d Cir. 2004) (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)).

Indeed, "a bill of particulars is not a discovery device and should not function to disclose

evidence, witnesses, and legal theories to be offered by the Government at trial or as a general

investigative tool for the defense." *United States v. Perryman*, 881 F. Supp. 2d 427, 430-31

(E.D.N.Y. 2012) (Spatt, J.) (citation and internal quotation marks omitted). "[T]he ultimate test

in determining whether a bill of particulars is appropriate is whether the information is

necessary, not whether it is helpful to the defendant." *United States v. Wilson*, 493 F. Supp. 2d

364, 370 (E.D.N.Y. 2006) (Garaufis, J.) (citation and internal quotation marks omitted). Thus,

"the defendant bears the burden of showing the information sought is necessary, and that he will

be prejudiced without it." *United States* v. *Shkreli,* 15-CR-637, 2016 WL 8711065, at *4

(E.D.N.Y. Dec. 16, 2016) (Matsumoto, J.) (cleaned up).

 "In making its determination, 'the court must examine the totality of the information

already available to the defendant—through the indictment, affirmations, and general pre-trial

discovery.'" *United States v. Huawei Techs. Co., Ltd.*, 18-CR-457, ECF No. 303, at *3

(E.D.N.Y. July 26, 2021) (Donnelly, J.) (quoting *United States v. Bin Laden*, 92 F. Supp. 2d 225,

233 (S.D.N.Y. 2000)). The discretion to grant or deny a motion for a bill of particulars rests in

the sound discretion of the trial court. *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.

1987).

 With regards to revealing the names of unnamed co-conspirators in a bill of particulars,

courts consider the following factors: "(1) the number of co-conspirators; (2) the duration and

breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate

notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-

conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the

Government's investigation." *United States v. Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000) (Scheindlin, J.).

## B.    Application

In Defendants' motion for a bill of particulars, Defendants assert the need for "guidance" as to what evidence supports the following Counts, without which Defendants claim they "cannot realistically identify the evidence against [them], let alone prepare [their] defense to each of the charges," Omni. Mot. at 26:

- Count One (operating an unlicensed money transmitting business): "which transactions of the more than 10,000 were allegedly completed for a fee" and "the amount of those fees," *id.* at 27;

- Count Two (failure to file CTRs): "which transactions allegedly comprise the failure to file CTRs charge," *id.* at 28;

- Counts Three through Seven (Bank Fraud Counts): "which of the thousands of transactions were allegedly the subject of misrepresentations to the bank," *id.* at 29;

- Count 17 (payroll tax conspiracy): "which checks, or at a minimum which individuals or entities' checks, were allegedly involved in the payroll tax conspiracy," *id.* at 31.

Defendants further request the names of the unnamed co-conspirators and John Does referenced in the Indictment to allow Defendants to adequately prepare for trial. *Id.* at 32-33. On reply, Defendants reject the Government's argument regarding Defendant Motovich's alleged witness tampering as a "red herring," as the Government could address concerns

regarding the use of the materials by seeking a protective order for the permitted uses of information in the bill of particulars. Omni. Reply at 14-15 n.10.

The Court denies Defendants' motion for a bill of particulars. Defendants have sufficient information about the charges they face to prepare a defense. They have access to the charges listed in the Complaint and Speaking Indictment, the time period of those charges, the Government's submissions pertaining to Defendants' pretrial motions, the Government's statements at oral argument and the suppression hearing, and the extensive discovery the Government has provided—including the information obtained from the iCloud Account and Midwood Lumber Warrants and supporting affidavits. This information, which provides notice of the nature of the charges as well as the date ranges within which Defendants committed the crimes, is sufficiently specific to inform Defendants of the charges against them, and to enable them to prepare a defense and plead double jeopardy. While the Court acknowledges the volume of discovery produced, *see* Omni. Mot. at 21 (noting discovery includes "nearly 200,000 pages"), the Court also recognizes Defendants have had much of these materials for more than two years, *see id.* at 27; Gov't Opp. at 62. These materials apprise Defendants—who are represented by experienced counsel—of the nature of the charges against them. *Cf. United States v. Bornovsky*, 820 F. 2d 572, 575 (2d Cir. 1987) (finding district court should have granted bill of particulars in a case where "the relevance of key events was shrouded in mystery"). As such, a bill of particulars for these counts is unwarranted. *See, e.g., United States v. Rivera*, 09-CR-619, 2011 WL 1429125, at *8 (E.D.N.Y. Apr. 13, 2011) (Feuerstein, J.) (denying defendant's request for a bill of particulars for evidentiary details and the precise nature of the evidence the government intended to offer at trial, including specific names, dates, and times, finding that information "beyond the scope of a bill of particulars"); *United States v. Persing*, CR-06-0815, 2008 WL

11344620, at *3 (E.D.N.Y. May 6, 2008) (Cogan, J.) (bills of particulars "should not be used to

provide the defendant with evidentiary detail about the government's case") (cleaned up); *United*

*States v. Levy*, S5 11 CR. 62 PAC, 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013) (Crotty,

J.), *aff'd*, 803 F.3d 120 (2d Cir. 2015) (denying motion for bill of particulars despite voluminous

discovery because defendant's "request for a recounting of each specific misrepresentation and

omission alleged "is simply a request to compel the production of the very type of evidentiary

minutiae that is not appropriate in a bill of particulars") (cleaned up).

The Court further denies Defendants' requests for the identities of the unnamed co-

conspirators and John Does named in the Indictment.  The Indictment alone provides sufficient

information about John Does 1 through 4 for Defendants to avoid unfair surprise and prepare for

trial.  Indictment ¶ 5 ("John Doe 1[] . . . was an employee of the Markovics Building Company

in or about and between January 2010 and 2017.  [Defendant] Motovich and Marina Kuyan,

without authorization, used John Doe 1's identity to open bank accounts in John Doe 1's name

into which Motovich and Kuyan deposited checks received from customers of the Motovich

Check-Cashing Business."); *id.* ¶ 6 ("John Doe 2[] . . . was an associate of [Defendant] Motovich

who permitted [Defendant] Motovich and the defendant Marina Kuyan to transact in bank

accounts opened in John Doe 2's name and into which, among other things, [Defendant]

Motovich and Kuyan deposited checks received from customers of the Motovich Check-Cashing

Business."); *id.* ¶ 25 ("[O]n or about June 5, 2019, [Defendant] Motovich attempted to convince

John Doe 3 to fire his lawyer and retain a lawyer that [Defendant] Motovich had chosen for John

Doe 3 and told John Doe 3 that if John Doe 3 did not do as [Defendant] Motovich asked,

[Defendant] Motovich would view John Doe 3 as a 'rat' and that it would be an 'issue' for John

Doe 3."); *id.* ¶ 8 ("John Doe 4[] . . . was an individual employed as a branch manager at a federal

41

savings bank in Brooklyn, New York ('Bank 1')[] . . . . John Doe 4 aided and abetted [Defendant] Motovich and Marina Kuyan by permitting and assisting them to open and transact in accounts at Bank 1 when [Defendant] Motovich and Kuyan had no authority to do so."); *see also id.* ¶¶ 7, 13, 20-21, 39, 42.

The Court further finds the six *Nachamie* factors weigh against the disclosure of other co-conspirators in this case. While the Court acknowledges the breadth and duration of alleged conspiracies are expansive—approximately seven years involving an unidentified number of co-conspirators and customers engaging in alleged financial crimes—these factors do not weigh in favor of disclosure on the allegations in this case. The Government alleges Defendant Motovich was heavily involved in the conspiracies alleged in the Indictment, running many of the alleged criminal offenses out of his business. *See, e.g.*, Indictment ¶ 1. Indeed, even Defendants note at least some of these co-conspirators are alleged to be Defendant Motovich's "customers." Mot. to Dismiss at 32. The conspiracies alleged here, despite their length and breadth, are not the type where Defendants are "more likely to be surprised by the identity of other co-conspirators, whom [they] may never have met." *Nachamie*, 91 F. Supp. 2d at 572. As noted above, while the Court acknowledges the volume of discovery in this case, the Court finds the Government has otherwise provided adequate particulars. Finally, Defendant Motovich's alleged witness tampering militates against disclosure in this case. Therefore, the Court denies Defendants' requests for disclosure of unnamed co-conspirators. *See, e.g.*, *United States v. Torres*, 901 F.2d 205, 233-34 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) (upholding district court's denial of a bill of particulars, including "other persons known and unknown" in the alleged conspiracy, speaking positively about the district court's finding that "[t]he indictment adequately advises defendants of the specific acts of which they

are accused" and "the defendants have been provided with a wealth of evidentiary detail from the discovery to date"); *Shkreli*, 2016 WL 8711065, at *6 (denying motion for a bill of particulars in part because co-defendant's prior "attempts to intimidate and influence witnesses" weighed against disclosure).

In short, Defendants have been adequately notified of the charges against them, and they have the information necessary to prepare a defense. Nothing more is required at this time. Accordingly, Defendants' request for a bill of particulars is denied.

## V.      MOTION FOR *BRADY* MATERIALS, INCLUDING IRS SAR AND JOHN DOE 1 STATEMENTS

### A.      Legal Standard

It is well-established that the Government must produce "evidence favorable to an accused" pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* applies to evidence that is exculpatory to the defendant or "would be an effective tool in disciplining witnesses during cross-examination." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012) (quoting *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002)). *Brady* does not require the disclosure of all exculpatory evidence; instead, the Second Circuit has clearly limited "*Brady* material" to encompass only evidence which has "a reasonable probability" of changing the outcome of a criminal trial or "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citations omitted). Further, "[w]here the [United States Attorney's Office] conducts a 'joint investigation' with another state or federal agency, courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012) (Rakoff, J.).

Regardless of the scope of the Government's disclosure obligation, *Brady* material need not be disclosed in response to a demand by a defendant. *See Coppa*, 267 F.3d at 142, 144. The prosecutor is entrusted with the initial determination of what to produce, and when to produce it. *See id.* at 142 ("The nature of the prosecutor's constitutional duty to disclose has shifted" to a "result-affecting test that obliges a prosecutor to make a prediction as to whether a reasonable probability will exist that the outcome would have been different if disclosure had been made."). Indeed, "it is the Government's responsibility to determine what evidence is material and when such evidence should be disclosed in time for its effective use." *United States v. Gustus*, 02-CR-888, 2002 WL 31260019, at *2 (S.D.N.Y. Oct. 8, 2002) (Swain, J.); *see also United States v. Badoolah*, 12-CR-774, 2014 WL 4793787, at *16 (E.D.N.Y. Sept. 25, 2014) (Matsumoto, J.) ("The required timing of such a disclosure depends on . . . the particular circumstances of each case; accordingly, the Second Circuit has refrained from defining the phrase 'in time for effective use.'" (quoting *United States v. Taylor*, 17 F. Supp. 3d 162, 177 (E.D.N.Y. 2014), *aff'd*, 802 F. App'x 604 (2d Cir. 2020)). However, "[a] district court has the discretion to order *Brady/Giglio* disclosure at any time as a matter of 'sound case management.'" *Taylor*, 17 F. Supp. 3d at 177 (quoting *United States v. Nogbou*, 7-CR-814, 2007 WL 4165683, at *3 (S.D.N.Y. Nov. 19, 2007)).

Courts in the Second Circuit generally do not compel immediate disclosure of *Brady/Giglio* materials where (1) the Government represents it is aware of and will comply with its *Brady/Giglio* obligations, and (2) the Defense does not provide any reason for suspecting the Government will not comply. *See, e.g.*, *United States v. Rivera*, 89 F. Supp. 3d 376, 396-97 (E.D.N.Y. 2015) (Matsumoto, J.) (declining to compel early disclosure where Government represented it was aware of its *Brady* obligations and would produce *Brady* materials

44

immediately upon becoming aware of such materials); *United States v. Cook*, 348 F. Supp. 2d 22, 30 (S.D.N.Y. 2004) (Robinson, J.) ("It is well established that pre-trial motions for discovery pursuant to *Brady* should be denied when the Government has made a good faith representation to the Court and defense counsel that it recognizes and has complied with its *Brady* disclosure obligations.").

### B.     Application

The Court denies Defendants' requests for the Court to compel the Government to immediately disclose both (1) the SAR and (2) material regarding John Doe 1.  The Government has maintained neither the requested SAR nor John Doe 1 materials are disclosable under *Brady*. *See* Gov't Opp. at 65 ("The government is aware of its obligations under *Brady* and its progeny, and [Defendant] Motovich is wrong both as a matter of fact and law" regarding the Government's obligation to produce the SAR); *id.* at 67 (stating the report does not contain exculpatory material); Omni. Reply at 15 ("[T]he government verbally informed counsel that it does not possess anything further [regarding John Doe 1] during an *ad hoc* conversation prior to the January 24, 2024 status conference").  With the Court recognizing the Government's duty to continue to disclose *Brady* material of which the Government becomes aware, the Court denies Defendants' requests for *Brady* material without prejudice. *See United States v. Messina*, 11-CR-31, 2012 WL 463973, at *12 (E.D.N.Y. Feb. 13, 2012) (Matsumoto, J.) ("[P]retrial motions for discovery pursuant to Brady should be denied when the Government has made a good faith representation to the Court and defense counsel that it recognizes and has complied with its Brady disclosure obligations.") (citation and internal quotation marks omitted).

With regards to the SAR specifically, Defendants assert the Government's decision to charge Defendant Motovich with payroll tax conspiracy as opposed to substantive payroll tax

fraud would be exculpatory and therefore disclosable under *Brady*. *See* Omni. Mot. at 37

("[T]here is a good faith basis to believe the reason the Government did not charge [Defendant]

Motovich with the underlying charge of payroll tax evasion is that the Government understood it

could not. . . . It is thus reasonable to anticipate that such documents . . . would directly

undermine the Government's § 371 charge for payroll tax conspiracy—the very definition of

*Brady*."); *see also* Omni. Reply at 18.  The Court agrees with the Government that its "decision

to charge one crime and not another does not mean, as [Defendant] Motovich contends, that the

Government must therefore be suppressing exculpatory evidence as to the charged crime."

Gov't Opp. at 66; *see also United States v. Doerr*, 886 F.2d 944, 966 (7th Cir. 1989) (upholding

district court's decision to exclude as irrelevant a SAR including a recommendation to

discontinue an investigation in part because "[c]riteria other than the merits of the investigation

itself may have gone into the prosecutorial decision to terminate the investigation" and "the

earlier IRS investigation involved Ms. Christofalos' failure to file personal income taxes, a

wholly different charge than the charge before the district court—conspiracy to impede the IRS

through fraudulent business transactions.").  Such speculation is insufficient to establish

materiality under *Brady*.  *See Mallet v. Miller*, 432 F. Supp. 2d 366, 378 (S.D.N.Y. 2006)

(Marrero, J.); *see also United States v. Jensen*, 3:09-CR-108, 2011 WL 1302908, at *11 (D.

Alaska Apr. 5, 2011) (after noting that SARs are discoverable only if they fall within Rule 16,

the Jencks Act, or are *Brady/Giglio*, the magistrate judge found "[t]he defendants' mere

speculation that such documents may contain references to civil liabilities is insufficient to

compel their discovery.  Mere speculation by the defendants does not entitle them to have

documents produced on the chance that they might contain helpful information.").  However, the

Court notes Defendants' requests regarding the SAR "put the prosecutor on notice as to what the

defense believes will be helpful to it," thereby "rais[ing] the level of the prosecutor's obligation of disclosure." *Jensen*, 3:09-CR-108, 2011 WL 1302908, at *12. As such, when continuing to comply with its *Brady* obligations, the Government should consider Defendants' requests in determining whether discovery must be disclosed pursuant to *Brady*.

## VI.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motions.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: June 11, 2024
Brooklyn, New York

47