UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

v.                                                    **MEMORANDUM & ORDER**
                                                      21-CR-497 (WFK)
DAVID MOTOVICH,

      Defendant.
------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On July 30, 2024, Defendant was found guilty by jury verdict on sixteen counts of an eighteen-count Indictment. *See generally* Indictment, ECF No. 2; Verdict Sheets, ECF Nos. 348–49. Defendant was convicted on: one count of Operating an Unlicensed Money Transmitting Business; one count of Failure to File Currency Transaction Reports; four counts of Bank Fraud; one count of Conspiracy to Commit Bank Fraud; seven counts of Money Laundering; one count of Aggravated Identity Theft; and one count of Conspiracy to Defraud the United States. The Court now sentences Defendant and provides a complete statement of reasons, pursuant to 18 U.S.C. § 3553(c)(2), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to 180 months' imprisonment; two (2) years' supervised release with both the special and standard conditions of supervision; restitution in an amount to be determined; forfeiture in accordance with the Preliminary Order of Forfeiture; and a $1,600.00 mandatory special assessment.

## I. BACKGROUND

Defendant operated a family-run business, Midwood Lumber. Presentence Investigation Report ¶ 10 ("PSR"), ECF No. 393. Midwood Lumber sold building materials and equipment to building contractors in the New York City metropolitan area. *Id.* Since at least 2012, Defendant also operated an illegal, underground check-cashing business from the Midwood Lumber office. *Id.*

In addition to himself, Defendant's scheme resulted in the arrest and indictment of several co-defendants and co-conspirators. *See, e.g., id.* ¶¶ 45, 47. Co-defendant Marina Kuyan was a Midwood Lumber employee who helped Defendant operate the illegal check-cashing business by, among other things, preparing fraudulent documents for check-cashing customers. *Id.* ¶ 11. Co-defendant Kemal Sarkinovic was a laborer directed by Defendant to open bank

accounts in his own name, which Defendant controlled and used as part of the illegal check-cashing business. *Id.* ¶ 12. One co-conspirator[1] was a bank branch manager at a federally insured savings bank who allowed Defendant and co-defendant Sarkinovic to open and transact in bank accounts under other people's names. *Id.* ¶ 17. Co-defendant Joshua Markovics (principal of multiple home-building companies), Philippos Adamou[2] (operator of a marble installation company), Joseph Russo[3] (owner of a steel-erection company and related entities), and another co-conspirator[4] (owner of a painting business) all used Defendant's services to cash checks in exchange for cash, minus Defendant's fee. *Id.* ¶¶ 13–16.

Defendant's office at Midwood Lumber, where he operated his illegal check-cashing business, had a secret room with two safes that "regularly contained hundreds of thousands of dollars in cash." *Id.* ¶ 22. Defendant's customers, including some of his co-defendants, primarily comprised principals of construction-related companies who paid their employees in cash to avoid tax-reporting requirements. *Id.* Defendant himself used cash to avoid paying payroll taxes on the wages he paid to his Midwood Lumber employees. *Id.* Over the course of the illegal scheme, Defendant cashed "millions of dollars of checks" in exchange for fees between 4% to 15% of the face value of the cashed check; Defendant's customers paid these fees—which were higher than the 2% to 3% fees typically charged by licensed check-cashing businesses—because they understood Defendant would not file Currency Transaction Reports ("CTRs") for transactions greater than $10,000.00, as required by the Bank Secrecy Act, 31

---

[1] *United States v. Doe*, 21-CR-400 (E.D.N.Y.) (Ross, J.).
[2] *United States v. Adamou*, 20-CR-456 (E.D.N.Y.) (Matsumoto, J.).
[3] *United States v. Russo*, 21-CR-364 (E.D.N.Y.) (Vitaliano, J.).
[4] *Sealed v. Sealed*, 22-CR-58 (E.D.N.Y.) (Kovner, J.).

U.S.C. § 5311, et seq. ("BSA").[5] *Id.* ¶ 23. Defendant and his check-cashing customers discussed these transactions using code words designed to conceal their unlawful activity. *Id.* ¶ 24.

To run his illegal check-cashing business, Defendant committed numerous other violations of law. Defendant, aided by co-defendant Kuyan and others, provided check-cashing customers with fake invoices to make the checks appear as though they were for real services and not simply cash. *Id.* ¶ 27. Defendant funded his illegal cash-checking business by acquiring cash from Coney Island Payroll Services, a licensed commercial check-cashing business located down the street from Midwood Lumber. *Id.* ¶ 26. Defendant did so by loaning the owners of Coney Island Payroll millions of dollars and establishing effective control over them. *Id.* Defendant also acquired cash from Midwood Lumber customers who avoided sales tax by paying cash and from "reverse" check-cashing customers who exchanged cash for a check, minus Defendant's fee. *Id.*

Over the course of the years-long conspiracy, Defendant created, or directed the creation of, at least eight shell companies to facilitate the illegal check-cashing operation. *Id.* ¶¶ 24–25, 28–29. Defendant pressured co-defendant Sarkinovic, who "relied on [Defendant] for his

---

[5] Under the Bank Secrecy Act, check cashers are defined as those individuals engaged in the business of "accept[ing] checks . . . in return for currency or a combination of currency and other monetary instruments or other instruments, in any amount greater than $1,000 for any person on any day in one or more transactions" qualified as institutions. *Id.* ¶ 19; 31 CFR § 1010.100(ff)(2)(i). Check cashers must register with the U.S. Department of Treasury's Financial Crimes Enforcement Network (FinCEN) as a money transmitting business. 31 CFR § 103.41. They must file Currency Transaction Reports (CTRs) with the federal government reporting transactions of more than $10,000.00. *See* 31 CFR § 103.22; *Guidance on Definition of Check Casher and BSA Requirements*, Financial Crimes Enforcement Network, https://www.fincen.gov/resources/statutes-regulations/guidance/guidance-definition-check-casher-and-bsa-requirements.

livelihood," to open bank accounts in his own name for several of the shell companies. *Id.* ¶ 30. Defendant also deceived Reginald Garcia, an employee of one of co-defendant Markovics's companies, into opening a shell company under his own name, without Garcia's knowledge or consent. *Id.* ¶ 31. Markovics lied to Garcia to induce him to provide his personally identifying information (PII) for Defendant's use in connection with this shell company. *Id.*

In opening these shell company bank accounts, and while each account was open and active, Defendant and his co-defendants made many materially false representations to the banks. *Id.* ¶ 33. They also forged the signatures of account signatories on multiple occasions. *Id.* Between 2012 and 2018, Defendant deposited more than $55 million dollars into the shell companies' bank accounts. *Id.* ¶ 35.

Although Defendant only reported an annual income of $200,000.00 to the IRS, Defendant was using his illegal proceeds to fund a luxurious lifestyle for himself and his family. For example, Defendant renovated his penthouse apartment (which includes an indoor swimming pool), purchased diamonds and luxury vehicles, and paid his real estate attorney over $2.5 million to effect real estate transactions. *Id.* ¶ 35. When searched, authorities found additional fraudulent documents at Defendant's apartment, including identification cards falsely identifying Defendant as a police chaplain and as the Head of Mergers and Acquisitions at UBS Bank. *Id.* ¶ 36.

*Procedural History*

On July 30, 2024, following his jury trial, Defendant was convicted on sixteen counts of an eighteen-count Indictment: one count of Operating an Unlicensed Money Transmitting Business (18 U.S.C. § 1960); one count of Failure to File Currency Transaction Reports (31 U.S.C. §§ 5313(a) and 5322(b)); four counts of Bank Fraud (18 U.S.C. § 1344); one count of

Conspiracy to Commit Bank Fraud (18 U.S.C. § 1349); seven counts of Money Laundering (18 U.S.C. § 1957(a) and (b)); one count of Aggravated Identity Theft (18 U.S.C. § 1028A(a)(1), (b) and (c)(5)); and one count of Conspiracy to Defraud the United States (18 U.S.C. § 371). *See* Verdict Sheet, ECF Nos. 348–49. The Court ordered Defendant immediately remanded. ECF Nos. 350–51.

On August 8, 2024, Defendant filed an interlocutory appeal for bail pending sentencing. Notice of Interlocutory Appeal, ECF No. 352. On September 10, 2024, the United States Court of Appeals for the Second Circuit denied Defendant's interlocutory appeal. USCA Order, ECF No. 355; USCA Mandate ECF No. 366.

On September 25, 2024, defense counsel filed a letter motion asking the Court to expedite Defendant's presentence interview with Probation and to schedule sentencing. Def.'s Ltr. Mot., ECF No. 362. The Court denied Defendant's request the same day. *Id.*

On November 18, 2024, defense counsel filed a motion for bond pending sentencing. Mot. for Bond Pending Sent'g, ECF No. 369. On December 6, 2024, the Court denied Defendant's motion for bond and continued Defendant's order of detention. Mem. & Order re: Bond Pending Sent'g, ECF No. 371.

On June 30, 2025, Probation filed Defendant's PSR. On July 15, 2025, the Government and Defendant filed their first sets of objections to the PSR, and on the following day, Defendant filed a request for a *Fatico* hearing. Gov't's First Objs. to PSR, ECF No. 397; Def.'s First Objs. to PSR, ECF No. 409-1.

On July 30, 2025, Defendant filed a motion for temporary bond to attend a religious family event. Def.'s Ltr. Mot. for Temporary Bond, ECF No. 402. On August 8, 2025, the

Court denied Defendant's motion and continued his order of detention. Mem. & Order re: Temporary Bond, ECF No. 407.

On August 12, 2025, the Government and Defendant filed their second sets of objections to the PSR and response papers to the first sets of objections. Gov't's Second Objs. to PSR, ECF No. 408; Def.'s Second Objs. to PSR, ECF No. 409-2.

On September 9 and 10, 2025, the Court held a *Fatico* hearing to determine disputed facts at sentencing. *See* Minute Entries for September 9, 2025, and September 10, 2025. The Court heard testimony on the loss amount at issue in the case and ordered post-hearing briefing, which the parties completed on October 24, 2025. *See* ECF Nos. 431–35. On November 12, 2025, Defendant submitted his sentencing memorandum. Def. Sent'g Mem., ECF No. 439. On November 17, 2025, the Government submitted its sentencing memorandum. Gov't Sent'g Mem., ECF No. 446.

## II. LEGAL STANDARD

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the United States Federal Sentencing Guidelines operate as the "starting point and the initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a district court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors

under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the United States Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among similar defendants found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

## III. ANALYSIS

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first Section 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

#### 1. *Family and Personal Background*

Defendant was born on December 9, 1974, in Brooklyn, New York. *Id.* ¶ 75. Defendant's parents currently reside in Belle Harbor, New York. *Id.* Defendant's father owns a building materials and tools distribution business. *Id.* Defendant has three siblings: a brother and two sisters. *Id.* ¶ 76. His brother resides in Brooklyn, while his sisters live in Lawrence, New York, and Woodmere, New York. *Id.* He is close to his parents and siblings, all of whom are aware of the instant offenses and remain emotionally supportive of him. *Id.* ¶¶ 75–76. Defendant's sister Gail Kastner was a co-conspirator in some of the instant offenses. *Id.* ¶ 24.

Defendant and his siblings were raised in a middle-income household; Defendant reports having a "contented" childhood, devoid of any abuse. *Id.* ¶ 77.

In 2000, Defendant married his wife. *Id.* ¶ 78. They have four children, all sons. *Id.* ¶ 78. Defendant reports having good relationships with his wife and children. *See, e.g.*, Def. Sent'g Mem. at 5–23; Ex. A to Def. Sent'g Mem., ECF No. 439-1. Indeed, in letters to the Court, Defendant's wife calls Defendant her "soul-mate" and each of his sons discuss their closeness with their father. Ex. A to Def. Sent'g Mem. at 14–15, 19–22, 23. Prior to his convictions and present incarceration, Defendant lived with his family a multi-floor penthouse apartment with a swimming pool. PSR ¶ 80. While incarcerated, Defendant's father has been financially supporting Defendant's wife and children. *Id.* ¶ 78.

    2. *Educational and Employment History*

In 1992, Defendant graduated Sephardic High School in Brooklyn. *Id.* ¶ 91. From 1992 to 1995, Defendant attended Brooklyn College, pursuing a bachelor's degree in business. *Id.* ¶ 90. He withdrew from school while recovering from his 1994 forklift accident, discussed below. *Id.* Between 1994 and 2021, Defendant worked at Midwood Lumber & Millwork Inc.—a company owned by his father—including as a Vice President. *Id.* ¶ 97. The instant offenses are connected to Defendant's work at Midwood Lumber. *Id.* Between 2006 and 2018, Defendant was a partner in a dialysis business until he and his business partners sold the company. *Id.* ¶ 98. Between 2021 and 2022, Defendant worked full-time as a manager at a pharmacy or was otherwise unemployed and financially supported by his business investments and through family assistance. *Id.* ¶ 94–96. From 2022 until his incarceration in July 2024, Defendant worked as a full-time director at Sherman Abrams Laboratory. *Id.* ¶ 93.

8

### 3. *Prior Convictions*

Defendant has no prior convictions, resulting in a criminal history score of zero and a criminal history category of I. *Id.* ¶¶ 68–73.

### 4. *Physical and Mental Health*

In 1994, while at work, a forklift ran over Defendant's left leg and ankle. *Id.* ¶ 84. Defendant was seriously injured; his left ankle still swells and he still experiences limited mobility from this accident. *Id.* Separately, Defendant reports having "been involved in many motor vehicle accidents throughout his life." *Id.* ¶ 85. Defendant presently suffers from gout. *Id.* ¶ 83. Due to his gout and his past car accidents, he experiences excruciating back pain. *Id.* Defendant was also previously diagnosed with prediabetes, coronary artery disease, high cholesterol, and eczema. *Id.* ¶ 86.

Defendant reports no history of mental or emotional health conditions. *Id.* ¶ 88. He reports feeling anxious and fearful due to the current environment at the MDC, including having witnessed fights and stabbings while incarcerated. *Id.* ¶ 87.

### 5. *Substance Abuse*

Defendant reports having been a social drinker prior to his arrest for the instant offenses. *Id.* ¶ 89. Although his alcohol consumption increased while on pretrial bond release, he has not consumed alcohol since being incarcerated at the MDC and is interested in receiving substance abuse treatment while in custody and afterwards to maintain his sobriety. *Id.* He reports never having used illicit drugs. *Id.*

### 6. *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

### B. The Need for the Sentence Imposed

The second Section 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's offenses, which involved financial fraud of millions of dollars and spanned multiple years. Defendant supervised these schemes, using his co-defendants—including family members and customers—to facilitate fraudulent transactions. And he did so out of sheer greed. *See supra* Section I. The Court also recognizes that Defendant's instant criminal scheme "was only discovered because he and his family were helping facilitate an entirely separate fraud" associated with the Fire Alarm Electrical Corporation ("Fire Alarm"). Gov't's Post-*Fatico* Sent'g Mem. at 55. In light of Defendant's "pivotal role" in that scheme, the Court agrees with the Government that a serious sentence is warranted to afford adequate deterrence. *See* Gov't Sent'g Mem. at 12, ECF No. 12.

The Court's sentence will deter others from engaging in similar acts and justly punish Defendant for his crimes. The Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a).

### C. The Kinds of Sentences Available

The third Section 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant was convicted of one count of Operating an Unlicensed Check Cashing Business, in violation of 18 U.S.C. § 1960. For this, he faces a statutory maximum term of five (5) years' imprisonment. 18 U.S.C. § 1960. He faces a statutory maximum term of three (3) years' supervised release. 18 U.S.C. § 3583(b)(2). He also faces a fine of the greater of maximum of $250,000.00 or twice the gross gain or twice the gross loss. 18 U.S.C. § 1960.

Defendant was also convicted of one count of Failure to File Currency Transaction Reports, in violation of 31 U.S.C. §§ 5313(a) and 5322(b). For this, he faces a statutory Maximum term of ten (10) years' imprisonment. 31 U.S.C. § 5322(b). He faces a statutory maximum term of three (3) years' supervised release. 18 U.S.C. § 3583(b)(2). He also faces a fine of the greater of a maximum of $500,000.00 or twice the gross gain or twice the gross loss. 31 U.S.C. §§ 5313(a) and 5322(b).

Defendant was also convicted of four counts of Bank Fraud and one count of Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. §§ 1344 and 1349. For this, he faces a statutory maximum term of thirty (30) years' imprisonment. 18 U.S.C. §§ 1344, 1349. He faces a statutory maximum term of five (5) years' supervised release. 18 U.S.C. § 3583(b)(1). He also faces a fine of the greater of a maximum of $1,000,000.00 or twice the gross gain or twice the gross loss. 18 U.S.C. §§ 1344, 1349.

Defendant was also convicted of seven counts of Money Laundering, in violation of 18 U.S.C. § 1957(a) and (b). For this, he faces a statutory maximum term of ten (10) years' imprisonment. 18 U.S.C. § 1957(b). He faces a statutory maximum term of five (5) years' supervised release. 18 U.S.C. § 3583(b)(1). He also faces a fine of the greater of a maximum of $250,000.00 or not more than twice the value of the funds involved in the transactions. 18 U.S.C. § 1957(a)–(b).

Defendant was also convicted of one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1), (b) and (c)(5). For this, he faces a statutory term of two (2) years' imprisonment, to run consecutive to any other term of imprisonment. 18 U.S.C. § 1028(A)(1). He faces a statutory maximum term of one (1) year of supervised release. 18 U.S.C. § 3583(b)(2). He also faces a fine of the greater of a maximum of $250,000.00 or twice the gross gain or twice the gross loss. 18 U.S.C. § 1028A(a)(1), (b), and (c)(5).

Defendant was also convicted of one count of Conspiracy to Defraud in the United States, in violation of 18 U.S.C. § 371. For this, he faces a statutory maximum term of five (5) years' imprisonment. 18 U.S.C. § 371. He faces a statutory maximum term of three (3) years' supervised release. 18 U.S.C. § 3583(b)(2). He also faces a fine of the greater of a maximum of $250,000.00 or twice the gross gain or twice the gross loss. 18 U.S.C. § 371.

Defendant also owes forfeiture in accordance with the Order of Forfeiture. *See* Preliminary Order of Forfeiture, ECF No. 447. He also owes restitution in an amount to be set forth in a forthcoming Order of Restitution. 18 U.S.C. § 3663. Finally, the Court is required to impose a mandatory special assessment of $100.00 per count under 18 U.S.C. § 3013(a)(2)(A), for a total of $1,600.00 in this case.

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense

The fourth Section 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." 18 U.S.C. § 3553(a)(4)(A).

At sentencing, the government bears the burden of proving by a preponderance of the evidence facts, disputed by the defense, that trigger a particular offense level increase, including

the amount of funds involved in the criminal offense and the tax loss caused by the defendant. *United States v. Navarro*, 156 F. App'x 384, 385–86 (2d Cir. 2005).

All parties agree Defendant's counts of conviction, with the exception of Count 16, should be grouped together. Gov't's First Objs. at 2; Def. Sent'g Mem. at 62. But the parties disagree about the group's total adjusted offense level. The Court first explains the Guidelines applicable to each count and the Guidelines under which the counts are grouped.

*Group One (Counts 1–14 and 17)*

The applicable Guidelines provision for both Counts One and Two is U.S.S.G. §2S1.3 (Structuring Transactions to Evade Reporting Requirements, etc.).[6] PSR ¶ 43. The applicable Guidelines provision for Counts Three through Seven is U.S.S.G. §2B1.1 (Larceny, Embezzlement, and Other Forms of Theft, etc.).[7] The applicable Guideline for Count Seventeen is U.S.S.G. §2T1.9 (Conspiracy to Impede, Impair, Obstruct, or Defeat Tax).[8] *Id.*

Counts One through Seven and Count Seventeen ("Group A") are grouped together, per U.S.S.G. §3D1.2(d), because the "offense level for each count is determined largely on the basis of the total amount of harm or loss, the offense behavior was ongoing and continuous in nature, and the offenses are of the same general type (fraudulent conduct)." *Id.*

The applicable Guidelines provision for Counts Eight through Fourteen ("Group B") is U.S.S.G. §2S1.1 (Laundering of Monetary Instruments; Engaging in Monetary Transactions in Property Derived from Unlawful Activity).[9] Probation groups these counts together before

---

[6] Counts One and Two involve violations of 18 U.S.C. § 1060 and 31 U.S.C. §§ 5313(a) and 5322(b), respectively.
[7] Counts Three through Six involve violations of 18 U.S.C. § 1344; Count Seven involves a violation of 18 U.S.C. §§ 1349 and 1344.
[8] Count Seventeen involves a violation of 18 U.S.C. § 371.
[9] Counts Eight through Fourteen involve violations of 18 U.S.C. § 1957(a).

13

further grouping them with Group A to form Group One. U.S.S.G. §2S1.1 n.6; see U.S.S.G. §3D1.2(c) (directing the Court to group counts of conviction where the defendant is convicted of both laundering funds and the underlying offense from which the laundered funds were derived).

*Count 16 (Aggravated Identity Theft)*

The applicable Guidelines provision for Count Sixteen is U.S.S.G. §2B1.6 (Aggravated Identity Theft).[10] PSR ¶ 42. Violations of 18 U.S.C. § 1028A carry a statutory term of two years, to run consecutively to any other term of imprisonment imposed. Count 16 is accordingly excluded from the multiple-count analysis.

*Combined Adjusted Offense Level*

Per U.S.S.G. §3D1.3(a), the offense level applicable to the grouped counts is the offense level associated with the most serious count of the group. U.S.S.G. §3D1.2(c). Probation contends the money laundering offenses (Counts 8 through 14) produce the highest offense level. PSR ¶ 43.

For money laundering offenses, the base offense level is the same as the offense level for the underlying offense (here, operating an unlicensed money transmitting business). Therefore, the base offense level is 6. U.S.S.G. §2S1.3(a)(2). Probation contends twenty-two (22) offense levels are added because the amount in loss was greater than $25,000,000.00 but less than $65,000,000.00. U.S.S.G. §2B1.1(b)(1)(L). Defense counsel disputes this calculation and, as noted above, the Court held a *Fatico* hearing to determine the amount in loss (see below subsection on Defendant's Guidelines Calculations). Another two (2) levels are added because Defendant knew or believed the funds were proceeds of unlawful activity. U.S.S.G.

---

[10] Count Sixteen involves a violation of 18 U.S.C. § 1028A.

14

§2S1.3(b)(1)(A). Another two (2) levels are added because Defendant committed the offense as part of a pattern of unlawful activity involving more than $100,000.00 in a twelve-month period. U.S.S.G. §2S1.3(b)(2). As a result, Probation calculates Defendant's total base offense level to be 32.

Several enhancements apply. Because Defendant was convicted under 18 U.S.C. § 1957, the offense level is increased by one (1) level. U.S.S.G. §2S1.1(b)(2)(A). Because Defendant was an organizer or leader of criminal activity involving five or more participants, some of whom are discussed above, the offense level is increased by four (4) levels. U.S.S.G. §3B1.1(a). And finally, because Defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice," the offense level is increased by another two (2) levels. U.S.S.G. §3C1.1. Although courts should be cognizant of allegedly false statements resulting from confusion and mistake, *see id.* Application Note 2, Defendant's testimony at trial includes deliberately false statements, not just hazy recollections. *See, e.g.,* PSR ¶ 37 (discussing Defendant's testimony he did not operate an illegal check-cashing business). Adopting these enhancements yields a total adjusted offense level of 39. *See* PSR ¶¶ 53–61.

Defendant has a criminal history score of zero, resulting in a criminal history category of I. *Id.* ¶ 70; U.S.S.G. Chapter 5, Part A. An offense level of 39 and a criminal history category of I result in a Guidelines range of 262–327 months' imprisonment. Prob. Sent'g Rec. at 1, ECF No. 393-1. Probation ends its analysis here, calculating Defendant's Guidelines range as 262–327 months' imprisonment. *Id.* The Government, on the other hand, argues that, because Count 16 (Aggravated Identity Theft) carries a mandatory 24-month consecutive sentence under 18 U.S.C. § 1028A, Defendant's "effective Guidelines range is 286 to 351 months' imprisonment." Gov't Sent'g Mem. to 6, ECF No. 446. The Government therefore adds the mandatory 24-

15

month consecutive sentence to the bottom and top of the Guidelines range calculated by Probation.

*Defendant's Guidelines Calculations*

Defense counsel contends the highest offense level for any count is 21. *See* Def. Sent'g Mem. at 50–66. Defense counsel reaches that total offense level by starting with the base offense level of seven (7) for the money laundering offenses (Counts 8 through 14), finding U.S.S.G. §2S1.1 to be applicable. Defense counsel contends the value of the funds is $647,337.00, and so at most fourteen (14) offense levels are added because the amount in loss was greater than $550,000.00 but less than $1,500,000.00. Def. Sent'g Mem. at 50; U.S.S.G. §2B1.1(b)(1)(H).

An offense level of 21 and a criminal history category of I result in a Guidelines range of 37–46 months' imprisonment. U.S.S.G. §5A. Defense counsel also disputes the four-level enhancement for Defendant's Aggravating Role (U.S.S.G. §3B1.1(a)), *id.* at 61–63; the two-level enhancement for Obstruction of Justice (U.S.S.G. §3C1.1), *id.* at 63–66; and argues that the Court should "impose a one-point reduction in the total offense level" under U.S.S.G. §3E1.1(b) for Acceptance of Responsibility, alleging the provision otherwise "violates the Sixth Amendment" right to trial. *Cf. United States v. Taveridze*, 769 F. Supp. 3d 264, 270–71, 273 (S.D.N.Y. 2025) (Rakoff, J.) (stating Section 3E1.1(b) violates the Sixth Amendment and "conclud[ing] that in . . . every case in which a defendant chooses to go to trial but is convicted by a jury . . . the formal calculation of the offense level must be reduced by one point").

*Value of the Funds*

The value of the funds determines how many offense levels are added to the base offense level for the grouped counts at Group One. Defense counsel argues "a fair calculation of the

16

value of the funds involved is $647,337." *See supra* subsection Defendant's Guidelines Calculations; Def. Sent'g Mem. at 50. Using this amount to calculate the offense level for money laundering offenses, defense counsel reaches a total offense level of 21. As discussed at the *Fatico* hearing, the Government contends the value of the funds is $38,298,867.85. Gov't Post-*Fatico* Mem. at 21. The Government's calculation includes payments to the Subject Companies from all three "tiers" of entities. Checks from Tier 1 Entities include those issued by principals who "admitted to law enforcement authorities that their deposits in the Subject Companies were in exchange for cash, or were otherwise demonstrably proven at trial," Def. Post-*Fatico*Mem. at 13 (citing Gov't Post-*Fatico* Mem. at 13); the majority of the companies in Tier 1 were owned or represented by cooperating witnesses who testified at trial, or by individuals who confessed to government agents. Gov't Post-*Fatico* Mem. at 13. Checks from Tier 2 Entities met the pattern of check cashing and were issued by companies owned or represented by individuals who the Government interviewed, attempted to interview, or subpoenaed during its investigation, but who claimed not to have any records of legitimate business with the Subject Companies or refused compliance. Gov't Post-*Fatico* Mem. at 14. Checks from Tier 3 Entities included those that met the "above-described pattern of check-cashing," but the companies' owners "were never subpoenaed or interviewed." *Id.* at 15. Using this amount to calculate the offense level for the money laundering offenses, the Government reaches a total offense level of 39.

The Court appreciates the sentencing arguments raised by all parties and has thoroughly considered each in turn. The Court adopts in part the Government's calculations for the value of the funds to include consideration of the Tier 1 and Tier 2 entities, for a value of the funds number of $25,406,394.50.

17

E.   **Pertinent Policy Statement(s) of the Sentencing Commission**

The fifth Section 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

The parties have not drawn the Court's attention to any pertinent policy statements. Finding none on its own, the Court proceeds to the next Section 3553(a) factor.

F.   **The Need to Avoid Unwarranted Sentence Disparities**

The sixth Section 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Defense counsel argues a downward variance is necessary to avoid unwarranted sentencing disparities. Def. Sent'g Mem. at 67. Defense counsel emphasizes Defendant "was convicted of regulatory crimes, where no individual victims suffered any loss," *id.* at 2, and provides a number of comparator cases for other defendants convicted of operating unlicensed money transmitting businesses in violation of 18 U.S.C. § 1960 in the Southern and Eastern Districts of New York, *id.* at 70–72. Defense counsel argues the Guidelines' enhancements for fraud-related offenses greatly overstate Defendant's appropriate sentencing range. *Id.* at 68–72. Defense counsel states "[c]ourts routinely issue below-Guidelines sentences in non-violent, non-narcotics fraud cases." *Id.* The Court has considered these facts and arguments in determining Defendant's sentence. For the reasons stated in this Memorandum and Order, and considering the other Section 3553(a) factors, Defendant's sentence avoids unwarranted sentence disparities.

G.   **The Need to Provide Restitution**

The seventh and final Section 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Restitution is

18

mandatory in this case pursuant to 18 U.S.C. § 3663A. On September 9 and 10, 2025, the Court held a *Fatico* hearing to address the value of the funds involved in Defendant's case. *See* Minute Entries for September 9, 2025, and September 10, 2025. In post-hearing briefing, the Government argued Defendant is responsible for $28,359,476.72 in restitution. *See* Gov't's Post-*Fatico* Reply at 14, ECF No. 435. Probation maintains Defendant is responsible for $26,437,237.82 in restitution. PSR ¶ 119. And defense counsel argues the Court should decline to impose restitution, arguing the Government has not shown tax harm justifying its requested restitution estimate. Def.'s Post-*Fatico* Opp'n at 43–45; Def.'s Sent'g Mem. at 82–83. The Court finds Defendant is liable for restitution, and the Court reserves determination of the precise amount of restitution at this time. The Court reserves its right pursuant to 18 U.S.C. § 3664(d)(5) to hold an evidentiary hearing within ninety (90) days after this sentencing to determine the specific amounts owed to Defendant's victims.

## IV. CONCLUSION

For the reasons set forth above, the Court sentences Defendant to 180 months' imprisonment; two (2) years' supervised release with both the special and standard conditions of supervision; restitution in an amount to be determined; forfeiture in accordance with the Preliminary Order of Forfeiture; and a $1,600.00 mandatory special assessment. This sentence is sufficient but not greater than necessary to accomplish the purposes of Section 3553(a)(2). The Court does not impose a fine considering Defendant's restitution and anticipated forfeiture obligations.

The Court expressly adopts the factual findings of the Sealed Presentence Investigation Report and Addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion.

SO ORDERED.

**s/WFK**
_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated:   November 19, 2025
         Brooklyn, New York